## United Aircraft Corporation *v.* International Association of Machinists et al.
### (two cases)

Alcorn, C. J., Thim, Ryan, Shapiro and Loiselle, Js.

Argued March 5—decided April 13, 1971

*Norman Zolot* and, of the District of Columbia bar, *Mozart G. Ratner,* for the appellants (defendants) in each case.

*John D. Fassett,* with whom was *S. Robert Jelley,* for the appellee (plaintiff) in each case.

ALCORN, C. J.  We are confronted with two appeals by the defendants from judgments awarding damages to the plaintiff in two cases which were tried together.  The appeals have been consolidated

for presentation to this court. In each action the plaintiff sought the recovery of both compensatory and exemplary damages from the defendants jointly and severally based on allegedly tortious acts committed in the course of an illegal strike. As the cases have been presented in the trial court and here, four different defendants representing three different union organizational levels are involved. One case relates to a strike which took place at the plaintiff's Pratt & Whitney Division factories in East Hartford and Manchester, Connecticut. The other case relates to a simultaneous strike at the plaintiff's Hamilton Standard Division factories in Windsor Locks and Broad Brook, Connecticut. The top level of union organization involved is the defendant International Association of Machinists, hereinafter referred to as International. The next in union jurisdictional authority under International is the defendant Aeronautical Industrial District Lodge No. 91, hereinafter referred to as District 91. International and District 91 are defendants in both cases. At the bottom of International's union organization are the defendant Industrial Aircraft Lodge 1746 of the International Association of Machinists, hereinafter called Lodge 1746, and Industrial Aircraft Lodge 743 of the International Association of Machinists, hereinafter called Lodge 743. Members of Lodge 1746 were employed at the plaintiff's East Hartford and Manchester factories and Lodge 1746 was a defendant, along with International and District 91, in the action involving the strike at those plants. Members of Lodge 743 were employed at the plaintiff's Windsor Locks and Broad Brook factories and Lodge 743 was a defendant, along with International and District 91, in the action involving the strike at those plants.

The defendants in each case filed identical pleas in abatement attacking the court's jurisdiction; the plaintiff demurred, and the court sustained the demurrers. The defendants in each case filed identical demurrers to the relief sought and the demurrers were overruled. The issues raised by these pleadings require no individual discussion because they are encompassed within the principal issues on this appeal. Following other preliminary pleading the issues were closed, trial was had first on the issue of liability and, subsequently, on the issue of damages. Judgment was rendered on November 26, 1968, that the plaintiff recover, in the case involving the strike in East Hartford and Manchester, damages of $1,369,725.25 with interest from August 12, 1960, exemplary damages of $197,333.33 and costs of $739.90; and, in the case involving the strike at Windsor Locks and Broad Brook, damages of $88,662 with interest from August 12, 1960, exemplary damages of $98,666.67 and costs of $241.70.

The court's finding, embraced in 866 numbered paragraphs covering 247 printed pages of the record, is the subject of a massive attack by the defendants. It would prolong this opinion beyond all reason to discuss the errors assigned in the finding. Suffice it to say that they have been carefully examined and that no correction which would have a material bearing on the decisive issues is required.

The plaintiff has filed a cross appeal in which it too assigns error in the finding and also in the court's failure to find that the defendants authorized, participated in and ratified the acts complained of, and in its finding and award of damages. Here again the claims concerning the finding have been carefully examined and no correction which would have a material bearing on the decisive issues is

found to be required. As in the case of the appeal, the claims of law and fact made in the cross appeal are disposed of in the ensuing discussion of the essential dispute between the parties.

The real issues raised by the appeal are: (1) whether the trial court had jurisdiction of the controversy, (2) whether the trial court erred in imposing liability on the defendants, and (3) whether the trial court erred in assessing damages. We will discuss those issues in that order.

## I

Based on the doctrine of federal preemption, the defendants assign error in the court's refusal to dismiss both actions on jurisdictional grounds. There is no denying the fact that the jurisdiction of the state courts over labor disputes has been greatly restricted by the passage of the Labor Management Relations Act, 1947, and the establishment of the Labor Management Relations Board. The complaints in these actions alleged in substance, however, that, while the plaintiff was negotiating collective bargaining agreements with Lodge 1746 and Lodge 743, all of the defendants joined in concerted and unlawful mass picketing, personal violence, invective and intimidation with the wilful and malicious purpose of coercing and preventing persons from entering the plaintiff's premises, as a result of which the plaintiff suffered severe financial damage. It is well established that state courts have jurisdiction over such tort actions. *United Mine Workers* v. *Gibbs,* 383 U.S. 715, 721, 729, 86 S. Ct. 1130, 16 L. Ed. 2d 218; *San Diego Building Trades Council* v. *Garmon,* 359 U.S. 236, 247, 79 S. Ct. 773, 3 L. Ed. 2d 775; *United Automobile Workers* v. *Russell,* 356 U.S. 634, 635, 646, 78 S. Ct. 932, 2 L. Ed. 2d

1030; *United Construction Workers* v. *Laburnum Construction Corporation*, 347 U.S. 656, 657, 74 S. Ct. 833, 98 L. Ed. 1025. The claim of the defendants that the court lacked jurisdiction is without merit.

The defendants also attacked the court's jurisdiction on the ground that "federal law prohibits employers from using state court damage suits, predicated on strike misconduct, as 'weapons of economic coercion,'" relying on an observation made in *Linn* v. *United Plant Guard Workers*, 383 U.S. 53, 64, 86 S. Ct. 657, 15 L. Ed. 2d 582. The assertion of the accepted right to bring a state court action for damages arising from tortious conduct, as in the present cases, does not come within the ambit of the proposition stated even if the case relied on supported it.

The defendants' claims that the actions are barred by waiver, estoppel and condonation are completely without merit and do not require discussion.

## II

We turn, then, to the question of the correctness of the trial court's conclusion that liability could properly be imposed on the defendants for the tortious acts complained of. Since these acts occurred in the course of a labor dispute, § 31-114 of the General Statutes becomes pertinent.[1] That statute, in substance, provides that liability cannot be imposed on organizations such as the defendants, participat-

---

[1] "Sec. 31-114. RESPONSIBILITY FOR UNLAWFUL ACTS. No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court for the unlawful acts of individual officers, members or agents, except upon proof of actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof."

ing or interested in a labor dispute, for the unlawful acts of its individual officers, members or agents except on proof of (1) actual participation in, (2) actual authorization of, or (3) ratification of those acts by the defendants.

The plaintiff invokes the doctrine of respondeat superior under the common law of agency. Its argument is, in the first place, that, assuming that § 31-114 applies to cases such as the present, the statute did not do away with the common-law rules of agency and, secondly, in effect, that common-law rules of agency apply in these cases because § 31-114 does not apply.

There is no legislative history available to aid us in determining the extent to which, if at all, the General Assembly intended § 31-114 to displace the rules of agency in the case of labor unions involved in labor disputes. In *Benoit* v. *Amalgamated Local 299,* 150 Conn. 266, 274, 188 A.2d 499, however, we said that the language of § 31-114 is so similar to the language of § 6 of the Norris-LaGuardia Act (47 Stat. 71, § 6, 29 U.S.C. § 106)[2] that the construction placed on the latter by the United States Supreme Court is particularly pertinent in our construction of § 31-114.

We are persuaded by the reasoning and conclusions in cases construing § 6 of the Norris-LaGuardia Act that the liability of these defendants is to be determined by the application of § 31-114 of our General Statutes and that the common-law rules

---

[2] "[47 Stat. 71, § 6, 29 U.S.C. § 106] No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

of agency are pertinent to § 31-114 only as an aid to determining actual participation in, actual authorization of, or ratification of the acts complained of. In other words, we believe that while a labor union which could properly be held to be liable under § 31-114 would probably also be liable under agency principles, nevertheless liability under common-law agency rules would not necessarily create liability under § 31-114.

The legislative history of § 6 of the Norris-LaGuardia Act, which we consider as somewhat of a twin to our own § 31-114, was reviewed in *United Brotherhood of Carpenters* v. *United States,* 330 U.S. 395, 67 S. Ct. 775, 91 L. Ed. 973. In that case the court said (p. 403): "We need not determine whether § 6 [of the Norris-LaGuardia Act] should be called a rule of evidence or one that changes the substantive law of agency. We hold that its purpose and effect was to relieve organizations, whether of labor or capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration." The court went on to state (p. 406): "We hold, therefore, that 'authorization' as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment. We are of the opinion that the requirement of 'authorization' restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the

officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or their officers or members who actually participate in the unlawful acts, except on clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence."

Congress thereafter enacted the Labor Management Relations Act (61 Stat. 136, 29 U.S.C. § 141), providing a statutory right of action for money damages in certain classes of labor disputes. 61 Stat. 159, § 303 (b), 29 U.S.C. § 187 (b). Section 303 of that Act was compared with § 6 of the Norris-LaGuardia Act in *United Mine Workers* v. *Gibbs,* 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218, in which the court stated (p. 736) that "the responsibility of a union for the acts of its members and officers [under § 303] is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6." See also *Riverside Coal Co.* v. *United Mine Workers,* 410 F.2d 267, 270 (6th Cir.) ; note, 63 Harv. L. Rev. 1035, 1039.

Thus, it appears that the United States Supreme Court construes common-law rules of agency to be applicable in actions under § 303 of the Labor Management Relations Act but not under the stricter requirements of § 6 of the Norris-LaGuardia Act, of which our § 31-114 is the counterpart. The plaintiff has overlooked this distinction in relying on

several federal decisions in which neither § 6 of the Norris-LaGuardia Act nor a state statute like § 31-114 was being considered.

We turn, then, to the specific question of the liability of the defendants, or any of them, under § 31-114. This involves consideration of the meaning of "actual participation," "actual authorization" and "ratification." We believe that the repetition of the word *actual* is of particular significance. Of course, as was mentioned in *Benoit* v. *Amalgamated Local 299,* 150 Conn. 266, 273, 188 A.2d 499, organizations such as these defendants can act only through the instrumentality of individuals. Likewise, it is generally understood that designated officers of such organizations are clothed with a general authority commonly accepted as incidental to the office held. We conclude that, in requiring *actual* authorization in order to impose liability, it is the intent expressed in § 31-114 to require more than the agency rules of respondeat superior and more than the general authority with which an officer of the organization is clothed by virtue of his office. We subscribe to the proposition that the statute requires proof by the plaintiff that the acts complained of were either expressly authorized by the organization to be charged or were such that they flowed from that authorization. *United Brotherhood of Carpenters* v. *United States,* 330 U.S. 395, 67 S. Ct. 775, 91 L. Ed. 973; *United Mine Workers* v. *Gibbs,* supra, 738–39.

The same limitations must be held to apply to ratification. The proof must be of a ratification knowingly made in express and direct acts or terms of assent to the acts complained of by the organization to be charged. Implied ratification such as the law of agency presumes from the acts of a principal

is not sufficient. "There can be no rigid require-
ment that a union affirmatively disavow such unlaw-
ful acts as may previously have occurred. . . .
What is required is proof, either that the union
approved the violence which occurred, or that it
participated actively or by knowing tolerance in
further acts which were in themselves actionable
under state law or intentionally drew upon the pre-
vious violence for their force." *United Mine Work-
ers* v. *Gibbs,* supra, 739.

When we come to the element of participation,
we conclude that if representatives of the organiza-
tion to be charged are proved to have actually taken
part in the illegal acts complained of then the orga-
nization can be held liable for those acts depending
upon the number and status of the persons par-
ticipating and the extent of the organization's knowl-
edge of and power to control their actions. In
applying this rule, care must be taken in cases such
as those before us to treat the individuals involved
in their proper relationship. We believe that, to the
extent that the liability of one organizational level of
the union is predicated in part on the acts of mem-
bers or officers of another organizational level,
knowledge of those acts by the organization sought
to be charged and its authority and ability to con-
trol those acts is relevant to the question of the
organization's liability.

Applying the foregoing principles to the material
facts found by the trial court, it is our conclusion
that, while a case may arguably be made for the
liability of these defendants on the ground of rati-
fication, liability should be made to rest on the
ground of actual participation in the illegal or tor-
tious acts complained of.

Summarizing, as briefly as we are able, the volu-

minous facts found by the trial court, and reciting only those which we consider to be material to our decision and not subject to correction, the picture presented is as follows: The president of International was Albert J. Hayes. A vice-president of International was Fred Coonley, who was responsible for the geographical area in which the plaintiff's plants were situated. Richard L. Thurer was International's representative assigned to supervise District 91 and Lodges 1746 and 743. District 91 had administrative control over Lodges 1746 and 743. District 91 and Lodges 1746 and 743 were affiliated with International. John K. Main was senior business representative, and George Cope, John R. Sullivan and Robert Nelson were business representatives of District 91. Cope was assigned to service Lodge 1746 and Sullivan was assigned to service Lodge 743. Raymond Jutras and Robert Davis were district organizers for District 91. David Fraser was president and William Stewart was vice-president of Lodge 1746. Butler J. Seedman was president and Edward Batchelder was vice-president of Lodge 743. Lodges 1746 and 743 represented bargaining unit employees of the plaintiff.

The plaintiff had two collective bargaining agreements with Lodge 1746 which terminated on December 4, 1959. The plaintiff had collective bargaining agreements with Lodge 743 which expired on April 21, 1960. Bargaining efforts on the agreements were proceeding unsuccessfully. Prior to said dates, namely, on November 30, 1959, Coonley and another International vice-president met in Hartford with Thurer, Fraser and Seedman and discussed plans for a strike. On April 10, 1960, at a meeting of the members of Lodge 1746, Jutras reported that he had been assigned "to start a future program

against" the plaintiff; that he had visited International's local lodge at the Republic Aviation Corporation, "for suggestions as to how to stage a successful strike"; that if they struck they must fight and fight hard and they would need hundreds of pickets, and also attorneys to fight injunctions. On April 11, 1960, at a meeting of District 91 attended by Main, Cope, Nelson, Davis, Sullivan, officers of District 91, and delegates from Lodges 1746 and 743, Jutras reported that he had been assigned to lay out machinery for strike action in Lodges 1746 and 743, that "we can get experienced help from Grand Lodge to train and help our membership," that he had visited International's local lodge at Republic Aviation, that Republic was "in the same class" as United, and that he had "learned much" at Republic. At the same meeting, Cope reported that District 91 was arranging for Hayes, president of International, to address a mass meeting of the members of Lodges 1746 and 743 on May 22, 1960, the meeting to be coordinated by vice-president Coonley. There had been violence in the Republic Aviation strike which had been considered a "precedent-setting victory" for International. The strike at Republic Aviation had been under Coonley's jurisdiction, and Joseph Curran had worked there under Coonley's supervision. Curran had been International's representative assigned to International's local union which struck against Republic Aviation. District 91 requested Coonley to assign Curran to address 409 picket captains from Lodges 1746 and 743 concerning their strike duties, and he did so on May 15, 1960. Main, as senior business representative of District 91, was in charge of the strike at the plaintiff's plants and had the function of obtaining the release of pickets who were

arrested. Jutras was his assistant and was to coordinate the activities of the other business representatives and district organizers. Cope and Nelson were assigned to supervise activities at the gates at the plaintiff's East Hartford plant, and Cope's intention was to block the gates so that employees would be unable to enter. Davis' assignment was to keep the gates manned by pickets.

A mass meeting, supervised by Coonley, was held as scheduled at the Bushnell Memorial Hall on Sunday, May 22, 1960, which was addressed by Hayes, president of International. The next day Lodges 1746 and 743 voted to strike. Direct responsibility for conducting the strike at the plaintiff's plants was delegated by International to vice-president Coonley and Thurer, International's representative, although such a delegation was not in accordance with International's usual policy. On May 25, 1960, Lodges 1746 and 743 applied to International for strike sanctions, and on June 2, International granted the sanctions. On June 8, 1960, the strike commenced at the plaintiff's East Hartford and Manchester plants about 9 a.m. and at the plaintiff's Windsor Locks and Broad Brook plants at about 9:55 a.m.

From June 8 through June 13, 1960, strikers marched by the hundreds, shoulder to shoulder, at the gates of the East Hartford plant, massed at the gates and blocked vehicles containing employees attempting to enter or leave, physically attacked employees attempting to enter or leave in automobiles or on foot, made contemptuous and threatening gestures to employees, shouted profanities, obscenities and threats of physical harm, shoved, kicked, pushed, slapped, and scratched employees, and broke mirrors and radio antennas and windows of automobiles attempting

to enter or leave the plant. The police were compelled to push strikers forcibly aside in order to clear passageways for vehicles entering or leaving the plant. Hundreds of automobiles containing workers turned away. The police attempting to control activities were shoved against and onto the hoods of automobiles. Nails, tacks and other sharp objects were strewn on the road surface. The occupants of automobiles and pedestrians were spat at. The registration numbers of automobiles and the identity of occupants of vehicles were ostentatiously noted, and vehicles and their occupants were photographed. The photographs were posted on the bulletin board at 1746's lodge hall to intimidate employees so that they would not go to work. Mirrors were used to reflect sunlight into the lenses of cameras which the plaintiff attempted to use to record pictures of the activities. The result was that at the gates of the East Hartford plant traffic was snarled and blocked for many blocks. The aforementioned activities were participated in by thousands of members and many of the stewards, picket captains and committeemen of Lodge 1746. Fraser, the president, and Stewart the vice-president of Lodge 1746, Nelson, the business representative of District 91, Cope, the business representative of District 91, Jutras, district organizer of District 91, and Thurer, International's representative, all participated personally in the activities described. Thurer reported daily by telephone to Coonley as to what was going on, and Coonley regularly came to Hartford during the strike to meet with Thurer. International's representatives G. Poulin, G. Page and A. Giglio were also present at or near the entrance to the plaintiff's East Hartford plant from June 8 through June 11.

From June 8 through June 13, the same tactics were employed at the plaintiff's Windsor Locks plant, Broad Brook plant and Manchester plant. More than 1000 members, and many stewards, committeemen and officers of Lodge 743 participated in the activities at the Windsor Locks and Broad Brook plants. Seedman, president, and Batchelder, vice-president, of Lodge 743 as well as vice-president William Merrigan and Sullivan, business representative of District 91, participated personally. Special representative James D. Moore and auditor Benner of International along with Thurer, Symington, Page and Poulin, all International representatives, were present at the entrances of the Windsor Locks and Broad Brook plants occasionally. The strike activities of Lodges 1746 and 743 were so similar as to indicate a concert of activities.

The plaintiff instituted injunction actions in the Superior Court to restrain the mass picketing, violence and other illegal activities, and an order to show cause was issued returnable June 13, 1960. The general counsel of International came to Hartford and, after conferences, stipulations were entered into in substance enjoining the defendants from engaging in mass picketing, interfering by force, violence or intimidation with employees and limiting the number of pickets at the plaintiff's gates. Another action was brought by the regional director of the Labor Management Relations Board in the United States District Court to enjoin International and Lodges 1746 and 743 from the unlawful activities taking place at the plaintiff's plants and, on June 16, a stipulation in substance similar to that issued in the Superior Court was entered into.

Following the issuance of the injunctions, the

strike continued until, on August 8 and 9, Lodge 743 and Lodge 1746, respectively, voted to end it. Between June 16 and August 8 and 9, however, the violence at the gates of the several plants materially decreased. The mass picketing ceased, but picketing in limited numbers continued. Pickets, however, still obstructed vehicles until required to move by the police, struck, coerced and threatened persons, and recorded registration numbers of automobiles and the names of the occupants. Trucks of the plaintiff's suppliers had difficulty in entering the plants or had to turn away, and private contractors were prevented from entering. District organizer Davis threatened an employee with bodily harm if she continued working. Thurer, International's representative, threatened bodily injury to the plaintiff's photographer.

During the strike International's general counsel came to Hartford and recommended that all of International's representatives and district organizers assigned to deal with the plaintiff be suspended but International took no action to suspend them. There is nothing in the finding to indicate that, until the stipulation in the injunction actions, any defendant made any effort to restrict the activities at the plaintiff's plants.

In discussing "actual authorization" in *United Brotherhood of Carpenters* v. *United States,* 330 U.S. 395, 409, 67 S. Ct. 775, 91 L. Ed. 973, the court said: "There is no implication in what we have said that an association or organization in circumstances covered by § 6 [of the Norris-LaGuardia Act] must give explicit authority to its officers or agents to violate in a labor controversy the Sherman Act or any other law or to give antecedent approval to any act that its officers may do." We think an analogous

rule applies under § 31-114 with respect to "actual participation" and that explicit authority to participate need not be proved in order to establish the organization's participation. The court found the activity which we have summarized to be tortious, as it obviously was. It further found that those acts followed concerted preliminary planning after study of the violence indulged in by International's local union in the Republic Aviation strike, which International had considered a "precedent-setting victory." From June 8 to 13, large numbers of members and officers of the several defendants actively participated in the extreme violence which took place at the several plants, many of the officers who participated held positions of the highest authority and responsibility in the several organizations, and, although they were obviously fully aware of what was going on, no effort whatever appears to have been made by any defendant to end or restrict the activity prior to the stipulations in connection with the injunction actions. Thereafter, acts of the same sort and by some of the same persons continued at the various plants, although in a lesser degree, until the strike ended in August. Even during this latter period there appears to have been no effort exerted by any defendant to end the violence completely. The activity was reprehensible in the extreme and it is not to the credit of any of the defendants to attempt to assert as a shield that the actions complained of were those of individuals divorced from their sponsorship. The trial court was fully warranted in concluding that all of the defendants were liable for the acts which occurred at the various plants between June 8 and August 8 and 9, 1960, because of their actual participation in those acts. *Riverside Coal Co.* v. *United Mine Workers,* 410

F.2d 267, 272 (6th Cir.). In view of this conclusion, we see no need for further discussion of the subject of actual authorization or ratification.

Other vicious and lawless acts are found by the trial court to have been committed by individuals away from any of the plaintiff's premises. These are found to have been inflicted on employees of the plaintiff and to have consisted of burning and otherwise damaging automobiles, homes and outbuildings, flooding the cellars of homes, releasing the air from automobile tires, and harassment on the highways. The admission of the evidence concerning some of these acts was objected to by the defendants and is assigned as error. It is unnecessary to discuss these assignments, and we have not recited these incidents as proven facts material to the issue of the defendants' liability for two reasons. In some instances, the evidence concerning some of the incidents consists of reports received by the plaintiff of acts done by unidentified persons. In other cases the evidence relates to acts which are not sufficiently shown to have been within the knowledge of any but the few persons concerned and thus not within the knowledge or control of the defendants. For these reasons we have concluded, without engaging in extended discussion of specific events, or rulings concerning the evidence relating to them, that the defendants are not shown to have participated within the meaning of § 31-114 in the acts, vicious and lawless as most of them were, which occurred other than at the gates or premises of the plaintiff's several plants and, consequently, are not liable for damages based upon those activities. To the extent that the court awarded damages arising from activities which occurred other than at the plaintiff's several plants we must find error.

## III

The trial court rendered judgments in the two cases for the plaintiff to recover a total of $1,754,387.25 in compensatory and exemplary damages. Both the plaintiff and the defendants assign error in the damages awarded. In assessing compensatory damages the trial court awarded the . plaintiff a sum attributable to losses caused by the involuntary absence of employees due to fear or compulsion resulting from the tortious acts which were committed both at the plaintiff's premises and elsewhere. We have concluded that the court erred in finding the defendants liable for tortious acts which were committed away from the plaintiff's premises. Consequently, the case must be remanded for a new trial on the damage issue. We, therefore, do not discuss in detail the plaintiff's and the defendants' assignments of error concerning the various aspects of the award of compensatory damages. We shall limit our discussion to matters which may serve to aid the trial court on the remand.

The defendants claim, in effect, that the court erred in allowing a recovery for losses which the plaintiff would inevitably have sustained from lawful strike activity. In support of this claim they correctly assert that a state court may properly award damages only for losses arising from tortious conduct and not for losses arising from protected strike activity. See *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 729–30, 86 S. Ct. 1130, 16 L. Ed. 2d 218. The short answer is that the court did limit its award only to damages arising from tortious acts.

The plaintiff claims in its cross appeal that the trial court erred in failing to award all of the losses incurred by the plaintiff as a result of the strike on

the ground that tortious strike conduct was so intertwined with lawful strike conduct as to preclude apportionment. The trial court overruled this claim and the plaintiff assigns error in this ruling. The plaintiff relies principally on *Milk Wagon Drivers Union* v. *Meadowmoor Dairies, Inc.,* 312 U.S. 287, 61 S. Ct. 552, 85 L. Ed. 836, as interpreted in *United Mine Workers* v. *Gibbs,* supra, 731. *Meadowmoor* was an injunction action in which the court held that a state court could properly enjoin picketing in itself peaceful which was contemporaneously enmeshed with concededly outlawed violent conduct. Subsequently, in *Youngdahl* v. *Rainfair, Inc.,* 355 U.S. 131, 139, 78 S. Ct. 206, 2 L. Ed. 2d 151, the court held that a state court could not enjoin both peaceful picketing and violent picketing, apparently treating the case before it as differing from *Meadowmoor* in that a pattern of violence was not established which would inevitably reappear if peaceful picketing were resumed. In *Teamsters Union* v. *Morton,* 377 U.S. 252, 84 S. Ct. 1253, 12 L. Ed. 2d 280, the court appears in effect to have applied the *Youngdahl* principle and held that damages could not be awarded for lawful strike activity although unlawful acts were indulged in by the union elsewhere. And in *United Mine Workers* v. *Gibbs,* supra, the court, in referring to *Meadowmoor,* said (p. 732) : "Where the consequences of peaceful and violent conduct are separable, however, it is clear that recovery may be had only for the latter." Here again, the answer is that, in the cases before us, the court was able to determine damages based only on the tortious acts.

The plaintiff has also assigned error in the court's overruling of its claim that the burden was on the defendants to establish the allocation of losses be-

tween peaceful strike activity and unlawful strike activity. The ruling was correct. It was the plaintiff's burden to prove the damages which it claimed had resulted from the tortious acts complained of. See *Grzybowski* v. *Connecticut Co.,* 116 Conn. 292, 294, 164 A. 632.

In assessing compensatory damages the trial court took as the measure of damages the monetary value of the plaintiff's losses due to the involuntary absence of employees because of fear and coercion as a result of the illegal tortious acts which occurred. The formula used by the court to determine such damages was to arrive at (1) the monetary value of the total strike loss sustained by the plaintiff because of a deprivation of a portion of its productive labor force, (2) how long the strike would have lasted absent the illegal tortious acts, and (3) the amount of absence on the part of employees which was involuntary because of fear and coercion resulting from the illegal tortious acts.

The trial court first computed the monetary value of the total damages sustained by the plaintiff because of its being deprived of a portion of its productive labor force at the Pratt & Whitney Division plants and at the Hamilton Standard Division plants. The figures arrived at were based primarily on two elements: (1) excessive manufacturing costs due to the diminution of the labor force, and (2) unabsorbed fixed overhead expenses, referred to as "wasted overhead," due to diminution of the labor force.

The court found that the plaintiff's standard accounting system afforded an adequate and reasonable basis for computing the plaintiff's excessive manufacturing costs and wasted overhead due to the man-days of labor lost. The defendants attack

this conclusion. It was enough that the court relied on evidence which showed "the extent of . . . [this item] as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S. Ct. 248, 75 L. Ed. 544; *Ball v. T. J. Pardy Construction Co.,* 108 Conn. 549, 551, 143 A. 855. For the same reason, it was proper for the court to rely on evidence concerning the plaintiff's manufacturing costs for the period from January to May, 1960, as a base for computing the plaintiff's excess manufacturing costs from June to August, 1960. Here, again, the defendants' claim of lack of exactness fails. In computing the excessive manufacturing costs the court included costs for corrective work, training, spoiled work, labor efficiency variance, premiums paid for overtime work made necessary by absent employees, and, in the case of Hamilton Standard, the cost of excessive "make or buy conversion." The defendants contested all these items. We believe, however, that the trial court properly computed excessive manufacturing costs. We believe, also, that the costs of wasted overhead as found by the trial court is supported by the evidence. In determining wasted overhead on remand, however, the overtime hours worked during the strike should be taken into account. See *Sheet Metal Workers International Assn., Local 223* v. *Atlas Sheet Metal Co.,* 384 F.2d 101, 110 (5th Cir.).

The defendants assign error in the court's ruling denying their offer to prove that the plaintiff had been reimbursed for its losses through the terms of government contracts. The claim is without merit. Under the collateral source rule the evidence would be inadmissible. See *Lashin v. Corcoran,* 146 Conn. 512, 515, 152 A.2d 639. The basis of our well-

established collateral source rule is that a wrong-doer shall not benefit from a windfall from an outside source. That rule is applicable in this as in any tort case.

Having arrived at a figure representing the value of the total strike damage sustained by the plaintiff due to deprivation of a portion of its productive labor force, the court next proceeded to determine the portion of this figure which represented the loss directly due to the involuntary absence of employees because of fear and coercion as a result of the illegal, tortious activities which had occurred. The court found that if the violence had not occurred, the strike would not have lasted beyond three weeks at the Pratt & Whitney plants and not more than six weeks at the Hamilton Standard plants. The court then went on to find the total number of employees at each plant prior to the strike, the number who reported for work and the number who left early on the first day of the strike, the percentage of those who failed to report for work during the first weeks of the strike because of fear or because they were unable to enter, and the percentage of involuntary absentees at the end of the strike. The court concluded that the defendants were not liable for damages for loss of man hours for the first three weeks of the strike at the Pratt & Whitney plants and for the first six weeks at Hamilton Standard; it found the mean percentage of employees who stayed out of work for the remaining period due to fear; and it applied that percentage to the plaintiff's total loss for that period and so arrived at the damages awarded.

The trial court's findings as to how long the strike would have lasted at the Pratt & Whitney plants and at the Hamilton Standard plants were based on

the testimony of a labor economist offered as a witness by the plaintiff, who gave his opinion, as an expert, as to how long the strike would have lasted at the plaintiff's plants had there been no violence. This testimony was admitted over the defendants' objection and the court's action in admitting the testimony is assigned as error by the defendants. The defendants introduced evidence through an expert witness who gave it as his opinion that it was impossible to predict the length of a nonviolent strike. The trial court specifically found that it did not believe this witness, and this is assigned as error by the defendants. We believe that the opinion of the plaintiff's witness as to how long the strike would have lasted, absent violence, was too speculative to be accorded significant weight and is not a sufficient basis for the court's finding concerning the length of the strike if violence had not occurred. See *Stephanofsky* v. *Hill*, 136 Conn. 379, 384–85, 71 A.2d 560.

It was not necessary for the trial court to attempt to estimate the length of time a nonviolent strike would have lasted. It had only to determine what damage resulted from the tortious acts. Whenever loss results to a party naturally and directly from the tortious or illegal act of another, the loss is the proper subject of judicial relief by compensation in damages. *Division 163* v. *Connecticut Co.*, 148 Conn. 563, 569, 173 A.2d 130; *Mourison* v. *Hansen*, 128 Conn. 62, 66, 20 A.2d 84. There must be a causal relation established between the tort and the damage sustained. *Robinson* v. *Southern New England Telephone Co.*, 140 Conn. 414, 418, 101 A.2d 491. The trier is concerned with reasonable probabilities. *Sheiman* v. *Sheiman*, 143 Conn. 222, 225, 121 A.2d 285; *Boland* v. *Vanderbilt*, 140 Conn. 520, 525, 102

A.2d 362. And the basic aim is to compensate the plaintiff for the loss caused by the tortious conduct so far as money can do so. *Youngset, Inc.* v. *Five City Plaza, Inc.*, 156 Conn. 22, 27, 237 A.2d 366. "Where a defendant has by his wrongful conduct made the calculation of damages difficult, he will not be heard to urge such difficulty as a reason for not assessing by approximation." *Crowell* v. *Palmer*, 134 Conn. 502, 510, 58 A.2d 729. "From the very nature of the situation, the amount of loss cannot be proved with exactitude and all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate." *Ball* v. *T. J. Pardy Construction Co.*, 108 Conn. 549, 551, 143 A. 855; *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 490, 234 A.2d 825; *Humphrys* v. *Beach*, 149 Conn. 14, 21, 175 A.2d 363.

Each of the actions at issue here sought damages caused by the defendants' "wilful and malicious" tortious conduct. Clearly enough, the defendants had the full right to stage a strike but they had no right to participate, as the evidence established that they did, in violent and unlawful acts at the gates of and on the premises of the plaintiff's several plants. Those acts occurred from June 8 to August 8 and 9, 1960. Their effect was to reduce the number of employees who would normally have been expected to report for work and this caused substantial loss to the plaintiff. For the damage proved to have been caused to the plaintiff by those acts, the defendants should be held liable under the established rules of tort liability. In computing the monetary value of the plaintiff's strike losses at the Pratt & Whitney Division plants and Hamilton Standard

Division plants due to the involuntary absence of employees because of fear and coercion as a result of the illegal, tortious activities which occurred at these plants, the trial court should, on remand, determine the amount of absence from the Pratt & Whitney Division plants which was involuntary as the result of the illegal, tortious activities which occurred at those plants from June 8 to August 8 and 9, 1960, and the amount of absence from the Hamilton Standard Division plants which was involuntary as a result of the illegal, tortious activities which occurred at those plants from June 8 to August 8 and 9, 1960. On the basis of the figures representing the monetary value of the total strike losses sustained by the plaintiff at each of these divisions due to the loss of productive labor and the figures representing the aforementioned amount of involuntary absence the damage to which the plaintiff is entitled may be determined.

There remains the question of whether the trial court properly determined the amount of absence from the Pratt & Whitney Division plants and the Hamilton Standard Division plants which was involuntary. The court made its determination in this regard mainly on the basis of the testimony of the aforementioned labor economist who was permitted, over the defendants' objection, to state his opinion as to the percentage of the plaintiff's employees who stayed away from their employment involuntarily, and the reception of this evidence by the court is assigned as error by the defendants. While expert opinion would be relevant provided the court accorded it persuasive weight as was done in these cases, other methods of determining the element of involuntary absence of equal or greater weight might be resorted to such as a representative sampl-

ing of employees who refrained from work. The evidence to be relied on for arriving at a reasonable approximation is for the court to decide. In determining the amount of involuntary absence, however, the trial court, as we have already stated, improperly took into account absence due to fear engendered by violence and illegal acts which took place away from the plaintiff's premises as well as absence due to fear engendered by violence and illegal acts which took place at the plaintiff's plants. Only the involuntary absences due to the violence and illegal acts at the plants should be considered.

The plaintiff alleged, and the court found, that tortious, illegal acts which occurred during the strike were wilful and malicious. Under these circumstances, the plaintiff was entitled to recover punitive or exemplary damages in an amount which would serve to compensate the plaintiff to the extent of its expenses of litigation less taxable costs. *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 488, 234 A.2d 825; *Triangle Sheet Metal Works* v. *Silver*, 154 Conn. 116, 127, 222 A.2d 220. The court found and awarded the legal fees and expenses exclusive of taxable costs incurred by the plaintiff in these cases including attorneys fees for successfully defending a case brought by the defendants in the federal courts seeking to enjoin the prosecution of these cases. This award was proper.

The trial court awarded interest on the sum determined as compensatory damages in each case from August 12, 1960. The defendants assign error in this action of the court. The defendants argue, however, that, since the plaintiff did not commence these actions until almost three years after August 12, 1960, interest should have been awarded only from the date of the judgments because the plaintiff

was responsible for the delay. The plaintiff counters with the argument that after the actions were brought the preliminary pleading indulged in by the defendants caused delay in getting the cases to judgment.

Both arguments miss the mark for we believe the court erred in the award of interest from August 12, 1960, because it was based on an unliquidated claim. We have uniformly held interest to be allowable from the date of injury on damages resulting from tortious injury to property. *Wells Laundry & Linen Supply Co.* v. *Acme Fast Freight, Inc.*, 138 Conn. 458, 463, 85 A.2d 907; *New York, N.H. & H.R. Co.* v. *Ansonia Land & Water Power Co.*, 72 Conn. 703, 705, 46 A. 157; *Regan* v. *New York & N.E.R. Co.*, 60 Conn. 124, 142, 22 A. 503. As the decisions indicate, however, such an award is limited to cases in which the damage is of a sort which could reasonably be ascertained by due inquiry and investigation on the date from which interest is awarded. Our previous discussion makes clear that the compensatory damages awarded in these cases is not of that description. Interest should have been awarded only from the date of the judgments.

## IV

The defendants' claim that these actions, having been brought in 1963 based on events which occurred in 1960 are barred by the Statute of Limitations is without merit. The three-year Statute of Limitations, § 52-577, is applicable to all tort actions other than those actions carved out of § 52-577 and enumerated in § 52-584 or another section. *Collens* v. *New Canaan Water Co.*, supra, 491.

None of the other claims of the parties merits any discussion.

The court found that the plaintiff had sustained substantial damage, but, as we have stated, the amount thereof must be recomputed because the court allowed the plaintiff nothing for acts which occurred in the period during which it found that a nonviolent strike might have lasted and did award damages arising from events which occurred off the plaintiff's premises. For the foregoing reasons we conclude that both cases must be remanded to the Superior Court solely for the purpose of reassessing the compensatory damages in accordance with this opinion.

There is error in part, the judgment is affirmed in each case except as to the amount of compensatory damages with interest awarded and a new trial is ordered in each case limited to that issue.

In this opinion the other judges concurred.