## PATRICIA KELSEY *v.* CONNECTICUT STATE EMPLOYEES ASSOCIATION ET AL.

LOISELLE, BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued November 14, 1979—decision released February 12, 1980

*Wesley W. Horton,* with whom, on the brief, was *Hadleigh H. Howd,* for the appellant (named defendant).

*Eugene N. Sosnoff,* for the appellee (plaintiff).

BOGDANSKI, J. The plaintiff Patricia Kelsey was removed from her position as secretary of the defendant Connecticut State Employees Association (hereinafter the defendant or the union) and brought an action against the union and four individual members for injunctive relief and for damages. At the conclusion of the jury trial on the claim for damages, the court directed a verdict in favor of the plaintiff on liability as against the union; the court also directed a verdict in favor of all individual defendants. The jury awarded the plaintiff ten dollars as nominal damages; $1000 as damages for the plaintiff's efforts to regain her office; no damages for emotional distress; and $15,000 as punitive damages. The defendant's motion for a directed verdict and motion to set aside the verdict were denied. From the judgment rendered, the defendant union took this appeal.

On the basis of the evidence before it, the jury could reasonably have found the following facts: The plaintiff, during the time in question, was a member and secretary of the defendant, a labor organization representing approximately 33,000 public employees working in the various departments and agencies of the state of Connecticut. All

officers, including the secretary, are elected by statewide representatives at the defendant's convention.

The defendant's executive board, of which the plaintiff was a member, held a meeting on December 16, 1975, and voted to oppose taking action in coalition with other unions representing state employees regarding an announcement by the governor that the work week of state employees was going to be increased from thirty-five to forty hours and that layoffs would be ordered. On December 18, 1975, the plaintiff, as secretary, issued a press release to reporters in the newsroom of the state capitol in which she criticized the defendant's "top leadership" for "stubborn, head-in-the-sand action" in "deciding not to cooperate with other public employee organizations trying to safeguard the jobs and future of state employees."[1]

On January 27, 1976, Donald J. Buinickas, a defendant and an officer of the union, preferred charges against the plaintiff after she had refused a request to retract the statement. The charges stated that the plaintiff "made statements contrary to her obligation to at all times bear true faith and allegiance" to the defendant and violated her "membership initiation obligation."

The defendant's executive committee voted to proceed with the charges and summarily suspended the plaintiff from her office. A "charge and trial board," consisting of three former presidents of

[1] On January 13, 1976, less than a month after having voted to reject coalition, the defendant executive board adopted a resolution that it was its policy "to work with any organization when this association feels it necessary to gain or protect any benefit for all state employees."

the defendant, found the plaintiff guilty as charged, and ordered her suspended from office. In its decision the trial board declared that a union member has the right of free speech but the union can "react . . . even to dismiss her . . . from office." The board's decision was upheld by the executive board on appeal. The plaintiff then initiated the suit which is the basis of this appeal.

On appeal, the defendant has raised the following issues: (1) the propriety of the court's action in directing a verdict for the plaintiff on liability; (2) the sufficiency of the evidence to justify an award of punitive damages; (3) the excessiveness of the punitive damages award; and (4) the propriety of the court's charge on the adverse inference rule.[2]

The defendant contends that the court acted improperly in directing a verdict for the plaintiff because there were issues of fact which should have been left to the jury to resolve on the issue of liability.[3] The propriety of the court's action in

[2] Claims of error not briefed or argued are treated as abandoned. *State* v. *Grayton,* 163 Conn. 104, 302 A.2d 246 (1972).

[3] The directed verdict has also been attacked on the ground that a proper motion was not before the court. In the plaintiff's "Motion for a Partial Directed Verdict," a request was made that the jury be directed to determine what damages, if any, the plaintiff was entitled to for the violation to her rights of free speech. At the same time, the plaintiff submitted a request to charge and supplemental requests to charge, which caused the court to remark that "although you call it [a] motion for partial directed verdict, you are asking really for certain instructions to the jury." The plaintiff responded that the instructions were "mandatory," after which the court answered that "you are asking me to, in effect, direct certain issues to be decided in favor of the plaintiff," and proceeded to instruct the jury to direct a verdict for the plaintiff on the issue of liability. On the basis of this record, we conclude that it was reasonable for the court to construe the combined requests as calling for a directed verdict on liability.

directing a verdict on the issue of liability depends on the resolution of the principal dispute in this case: whether a union officer has the right to criticize the union's leadership when such criticism in no way impairs the officer's ability to function effectively in implementing union policies.

The trial court concluded that the plaintiff had the right to issue the statement; that the policy of the law is to encourage free discussion within unions; that there can be no reprisals for expressing views which differ from those approved by the majority; that the fact that the plaintiff was an officer of the union when she released her statement did not impose any restrictions upon her right to express her dissenting views. The court further observed that nothing in the union's "constitution or bylaws . . . restricted [the plaintiff] from dissenting from her fellow officers upon the matter involved or from expressing her views publicly." Nor was there any evidence in the case that the plaintiff's "issuance of a statement impaired her ability to continue to function as secretary."

Honestly run and democratic unions are the keystone of the national labor policy.[4] Congress, in enacting the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA); 73 Stat. 519–541, 29 U.S.C. § 401-531 (1976) (the Landrum-Griffin Act); clearly affirmed the public interest in protecting democratic processes in unions, and explicitly protected union members in the free exercise of those political rights essential for self-government. The LMRDA for the first time promulgated a "Bill of Rights" for union members by

---

[4] See Summers, "The Law of Union Discipline: What the Courts Do In Fact," 70 Yale L.J. 175 (1960).

guaranteeing to each member "equal rights" within the organization including the right "to meet and assemble freely with other members; and to express any views, arguments, or opinions." 73 Stat. 522, 29 U.S.C., § 411 (a) (2) (1976).[5] Commenting on the need for the reforms enacted by LMRDA, Representative Phillip M. Landrum stressed the "significant lack of democratic processes in certain unions, that one-man dictatorships have thrived – in some instances for 20 to 30 years – and that through intimidation and fear, the rank-and-file union member has been deprived of a voice in his own union affairs." 105 Cong. Rec. 14342 (1959).

*Newman* v. *Local 1101, Communication Workers of America,* 101 LRRM 2265 (2d Cir. 1979),[6] is typical of cases decided under the LMRDA involving union officials disciplined for the exercise of their free speech rights.[7] The Court of Appeals upheld the District Court's order reinstating the officer of the defendant union to his former post. The District Court concluded that the officer's expression of his views "did not preclude him from performing

[5] Although unions that exclusively represent public employees are excluded from coverage under the act; see 73 Stat. 520, 29 U.S.C. § 402 (e) (1976); cases construing and applying federal law are of persuasive, even though not controlling, authority in determining state law covering the same subject matter, that is, the determination of the parameters of a cause of action by a wrongfully disciplined union official against the union.

[6] The legend LRRM refers to the Labor Relations Reference Manual published by the Bureau of National Affairs.

[7] Even prior to the enactment of the LMRDA, New York's highest appellate court in *Madden* v. *Atkins,* 4 N.Y.2d 283, 151 N.E.2d 73 (1958), placed that state squarely in support of safeguarding free speech rights of union members, writing (p. 293): "If there be any public policy touching the government of labor unions . . . it is that traditionally democratic means of improving their union may be freely availed of by members without fear of harm or penalty. And this necessarily includes the right to criticize current

his duties and effectively acting as a representative of the Local." 99 LRRM 2755, 2756 (S.D. N.Y. 1978).

In *Salzhandler* v. *Caputo,* 316 F.2d 445 (2d Cir. 1963), cert. denied, 375 U.S. 946, 84 S. Ct. 344, 11 L. Ed. 2d 275 (1963), the court ruled that under the LMRDA a union was prohibited from removing from office, or otherwise disciplining, a financial secretary for allegedly making libelous statements about the handling of union funds by other union officers, noting that "[s]o far as union discipline is concerned Salzhandler had a right to speak his mind and spread his opinions regarding the union's officers, regardless of whether his statements were true or false." *Salzhandler* v. *Caputo,* supra, 451. In *Grand Lodge of International Assn. of Machinists* v. *King,* 335 F.2d 340 (9th Cir. 1964), cert. denied, 379 U.S. 920, 85 S. Ct. 274, 13 L. Ed. 2d 334 (1964), the Court of Appeals held that a union officer may not be disciplined for exercising the free speech rights guaranteed to union members by the LMRDA. The court noted that to find that an officer-member's rights of free speech and assembly were not guaranteed by the act "would deny protection to those best equipped to keep union government vigorously and effectively democratic." *Grand Lodge of International Assn. of Machinists* v. *King,* supra, 344. See also *Cooke* v. *Orange Belt District Council of Painters,* 529 F.2d 815 (9th Cir. 1976); *Wood* v. *Dennis,* 489 F.2d 849 (7th Cir. 1973), cert.

union leadership and, within the union, to oppose such leadership and its policies. . . . The price of free expression and of political opposition within a union cannot be the risk of expulsion or other disciplinary action. In the final analysis, a labor union profits, as does any democratic body, more by permitting free expression and free political opposition than it may ever lose from any disunity that it may thus evidence."

denied, 415 U.S. 960, 94 S. Ct. 1490, 39 L. Ed. 2d 575 (1974); *Gabauer* v. *Woodcock,* 520 F.2d 1084 (8th Cir. 1975).

We need not decide to what extent the common law free speech rights of union officers are coextensive with those of union members, nor it is necessary to decide what kind of showing of harm to the union is necessary to require a court to balance the free speech rights of union officers against their duties toward the union and its leadership. In the tension between conflicting rights and duties of the union and its agents, the balance to be struck depends on whether the union officer's exercise of his free speech rights may reasonably be viewed as impairing his ability to continue to function effectively as such an officer, thereby causing harm to the union. In other words, the inquiry must be focused on a determination of the evidentiary question of whether an officer's opposition to the union's policies may be reasonably viewed as precluding him from acting effectively as its representative, and whether his removal from office would tend to prevent him or others from exercising their free speech rights.

The record in the present case is devoid of any evidence that the defendant union was harmed in any way as the result of the press release. Moreover, it appears that the defendant subsequently adopted the very position that the plaintiff advocated. The trial board's finding that "her conduct is described as 'tending to injure the good name of the organization, disturb its well-being, or hamper it in its work' " utterly fails to show how the plaintiff's conduct precluded her effective representation

of the union.[8]  Before disciplining a union officer for exercising rights of free speech, it is essential that the union make a determination that the conduct in question precludes the officer from performing his duties.  The record fails to reveal any evidence that either the member who preferred the charges, the "charge and trial board" which ordered her suspension, or the executive board which upheld the trial board's decision, made any determination that she was precluded from performing her duties as a result of her press release.  Rather, it is apparent that the plaintiff was disciplined because the published matter was critical of the union's leadership.[9]

Although the defendant disagreed with the trial court's conclusion that the plaintiff's function was not as a policymaker, it offered no evidence concerning her function other than that she was a voting member of the executive committee.  Absent such evidence it would be untenable to conclude that the issuance of the press release in any way impaired the plaintiff's ability to continue to function as secretary and a member of the executive committee.

We therefore conclude that the plaintiff's published opposition to the defendant union's policy may not be reasonably viewed as precluding her acting effectively as its secretary.  Since the evi-

[8] The only other evidence of harm to the union was a statement by the defendant's treasurer that the plaintiff's press release "was detrimental to the organization since it was an organizational campaign with a rival union."

[9] The practical effect of the defendant's action would be to preclude those who are sharply critical of the leadership from running for an elective office, thereby insulating the leadership from all but the most tame and ineffectual criticism.

dence is such that the minds of fair and reasonable persons could reach but one conclusion, the trial court did not err in directing a verdict in favor of the plaintiff. See *Engengro* v. *New Haven Gas Co.*, 152 Conn. 513, 209 A.2d 174 (1965).

The defendant also claims that the court erred in giving a charge on punitive damages when there was insufficient evidence of "malice," "ill will" or "deliberately attempting to punish [the plaintiff] for exercising her right to free speech" to justify such a charge. We disagree. In view of the absence of any evidence to justify the defendant's action, a finding by the jury that the defendant's illegal actions were wilful and done with reckless indifference to the plaintiff's rights cannot be disturbed.

Since the jury was warranted in finding that the defendant acted with reckless disregard of the plaintiff's free speech rights, the plaintiff was entitled to recover punitive damages to compensate her to the extent of her expenses of litigation less taxable costs. *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 234 A.2d 825 (1967); *United Aircraft Corporation* v. *International Assn. of Machinists*, 161 Conn. 79, 285 A.2d 330 (1971). Evidence of those expenses must be submitted to establish a basis for an award of punitive damages. *Chykirda* v. *Yanush*, 131 Conn. 565, 41 A.2d 449 (1945). The plaintiff's attorney testified from the firm's time records that the firm had rendered 228.35 hours of service to the plaintiff at an agreed rate of fifty dollars per hour. In addition, there was approximately $690 in reimbursable expenses. This evidence clearly supports a punitive damage award of $15,000.

Lastly, the defendant claims that the court erred in charging the jury that the failure of a party to produce a witness whom it was within his power to produce, and who would naturally have been produced by him, permits an inference that the evidence of the witness would have been unfavorable to the party's cause.[10] Since the defendant failed to call as witnesses the three individual defendants who were present in the courtroom throughout the trial,[11] individuals who, by reason of both their relationship to the defendant and their roles in the actions which form the gravamen of the plaintiff's complaint, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the defendant would have produced, the trial court did not err in its charge.

There is no error.

In this opinion the other judges concurred.

---

[10] This is commonly referred to as the *"Secondino* charge." See *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960).

[11] The defendant Donald J. Buinickas, the president of a C.S.E.A. chapter and an alternate C.S.E.A. executive board member, preferred the charges against the plaintiff which led to her suspension; the defendants Hugo F. Benigni and James F. Quinn, both past presidents of C.S.E.A. and then members of C.S.E.A. standing committees, served on the trial board which suspended the plaintiff. The other individual defendant, James W. Moore, who was the third member of the trial board, was not present at the trial due to illness.