OPINION OF THE COURT
David Goldstein, J.
This is an omnibus motion by defendant, inter alla, to inspect the Grand Jury minutes and to dismiss the indictment, based upon several grounds, including (1) insufficiency of the evidence before the Grand Jury, (2) inadequate legal instructions to the Grand Jury, and (3) prosecutorial misconduct, consisting of improper and excessive cross-examination of defendant, especially in relation to the nature and scope of his Grand Jury testimony.
The indictment (No. 1558/92) charges defendant with two counts of murder in the second degree (intentional murder and depraved indifference murder), manslaughter in the first degree and criminal possession of a weapon in the fourth degree. It is claimed that, on March 4, 1989, defendant entered the John Miller Realty office at 214-85 Jamaica Avenue, with a cup containing a caustic lye mixture and threw it at Miller’s head and face. This caused Miller to ingest the caustic substance, resulting in serious injuries and illness, which led to his death on December 27, 1991.
A prior indictment (No. 2697/90) had charged defendant with attempted murder in the second degree (1 count), assault in the first degree (6 counts) (involving serious and disfiguring injuries to John Miller and his daughter, Theresa Webb), assault in the second degree (1 count) and reckless endangerment in the first degree (2 counts). The People cross-move to consolidate the two indictments inasmuch as both arise out of the same criminal activity.
Danielle Washington, who was employed as a secretary at the realty office, testified that, on March 4, 1989, a man wearing a brown leather jacket, a fisherman’s hat, blue jeans and work boots, entered the office and asked to speak to John. *47 He was holding a styrofoam cup with a tea bag hanging out and smoke was coming out. She told Theresa Webb, who went to the back to get her father. The man paced back and forth for about five or 10 minutes, mumbling to himself and then walked to the back. The next thing she remembered was Theresa yelling for help and Mr. Miller coming up front, on his knees, in pain and gasping for air. She called an ambulance, which took him to Long Island Jewish Hospital. The admitting diagnosis was chemical burns to the face and esophageal burns and stricture, eye, mouth, lips and throat.
The next time she saw the man with the fisherman’s hat was about one month later. He was standing outside the office, looking through the front window and shaking his head, whereupon she called the police. Defendant was arrested some time later.
Miller lingered for more than two years. In 1991, Dr. Kenneth Ackerman treated him at North Shore Hospital for respiratory distress and difficulty breathing. His impression was that, at that time, Miller was suffering from pneumonia. During the intervening two-year period, he had undergone numerous surgical procedures. The most prominent, a colonie interposition surgery on August 3, 1989. This procedure involved the reconstruction of the esophagus by use of a portion of the intestine. One of the complications encountered in this surgery was the absence or insufficiency of communication between the trachea and the esophagus, causing secretions and saliva to enter the lung, which led to repeated bouts of bacterial pneumonia. At the time of his death in December 1991, Miller weighed about 100 pounds, far less than his former weight of over 200 pounds. In the two-year period, he had over 17 hospital admissions.
Dr. Michael DeMartino, who was with the Nassau County Medical Examiner, performed the autopsy on Mr. Miller and testified that the immediate cause of death was severe pneumonia of both lungs. Dr. DeMartino was of the opinion that the decedent had been prone to recurrent pneumonia as a result of the surgical alteration, which caused him to aspirate food or liquid into the wind pipe and the lungs. The autopsy reflected evidence of scars from burns, which Dr. DeMartino opined were consistent with ingestion of a caustic substance. He was also of the view that the type of injury which Miller sustained would make one prone to aspiration pneumonia.
Defendant testified before the Grand Jury, making one *48 simple statement, as follows: "I’ve never been — I’ve never been in this man’s office in my life.”
Following defendant’s statement, the District Attorney proceeded, for the next 20 pages, with a pointed cross-examinatian, which was aggressive and somewhat abusive and hostile, centered almost entirely upon defendant’s prior criminal record. From the transcript, it appears that this prior record consisted of resisting arrest in 1986, petit larceny in 1988, attempted criminal contempt in 1989 and loitering and resisting arrest in 1990. Also elicited was that a bench warrant had been issued in 1989 when defendant failed to come to court.
The tenor of the cross-examination was to establish that, in the past, defendant had committed acts of violence directed toward persons he didn’t even know. When asked about his having disobeyed a court order to stop harassing someone, the District Attorney inquired — "And you didn’t know that person, did you, either, did you?” Defendant replied, "That’s my grandmother, yes. That was * * * a house [sic] of protection * * * I wanted to see my grandmother, it was over her birthday.” At another point, the assistant pointingly inquired of defendant: "So is it correct, Mr. Jones, that you fight with people that are strangers, police officers, correct?” The prosecutor’s aggressiveness, to the point of blatant hostility, is evident in other portions of the cross-examination:
"Q. So you were loitering and when the officer went to arrest you, you got involved in the struggle with this officer, resisting arrest once again, correct?
"A. Yes, indeed, sir.
"Q. So you’ve gotten involved with harassing involving your own grandmother and resisting arrest and struggling with officers you don’t know, correct?
"A. Yes.
"Q. And yet you say that you never been in the store of Mr. Miller?
"A. But I didn’t give an explanation. I never put my hand on it, it was just a dispute, a verbal dispute.
"Q. A verbal dispute?
"A. A verbal dispute.
"Q. And you never did anything more than just arguing?
"A. That’s correct.
"Q. So when the officer charged you with actually physically *49 resisting arrest and you plead guilty to it, that was incorrect; is that what you’re saying now?
"A. I resisted arrest.
"Q. Okay. So when you just told the jury a moment ago that it was just words is not correct, you in fact physically resisted arrest by this officer?
"A. I resisted arrest.
"Q. Okay. It is true, isn’t it?
"A. Yes, pleaded because it was loitering and resisting arrest.
"Q. And you plead guilty because you were guilty, right?
"A. Yes.
"Q. Okay. And again that case is where you plead guilty and there are other cases where you haven’t plead guilty but chose to testify at trial?
"Q. Excuse me, please.
"Q. You’ve had some cases where you plead guilty and you’ve had other cases where you’ve chosen not to plead guilty but testify at trial and still been convicted, correct?”
The plain purpose of the cross-examination was to convey to the grand jurors defendant’s propensity toward violence, especially strangers, and his lack of respect for court mandates and orders. It was also suggested that, because of this propensity and disrespect, he must have committed this crime:
"Q. So is it correct, Mr. Jones, that you fight with people that are strangers, police officers, correct?
“A. Excuse me.
"Q. That you fight with people that are police officers?
"A. No, I don’t.
"Q. You were charged with resisting arrest, correct?
"A. No, I don’t fight with them at all.
"Q. And you plead guilty to resisting arrest?
"A. Yes.
"Q. On more than one occasion?
"A. On one occasion.
"Q. And if a court order is issued and you don’t like what the court ordered and you feel like doing what you want to do, you’re going to do what you want to do rather than what the court orders; correct?
"A. No, that’s not true.
*50 "Q. That’s not true. So you didn’t try to continue to harass your grandmother after the court ordered you not to go near her?
"A. No.
"Q. But did you plead guilty to attempting to?
"A. I pleaded guilty, yes.
"Q. Did you — but now you’re saying you didn’t do it, right?
"A. Excuse me.
"Q. Now you’re saying, even though you plead guilty, you didn’t do it?
"A. I just — I needed food. I was unemployed. I needed — I needed — I get a disability check every day — I mean every month and I go over to get my check and I meeted her sometimes breakfast in the morning.
"Q. So you did do it even—
"A. Yes.
"Q. — even though the court ordered you not to go there, you continued to go there and harass her, correct?
"A. On one occasion, one, two, occasions.
"Q. And on that one or two occasions caused you to be arrested and come into court and plead guilty to attempted criminal contempt of the court order to leave your grandmother alone, right?
"A. Yes, I pleaded guilty to it.
"Q. So were you guilty of it?
"A. I served time on — yes, I was guilty.
"Q. But you were, in fact, guilty?
"A. Yes, indeed, I was guilty.
"Q. So when you said you didn’t do it, that was incorrect, right?
"A. Yes, I am guilty.
"Q. You did do it?
"A. I pleaded guilty to that, I served time on that.”
The traditional function of the Grand Jury is to ensure that, "before an individual may be publicly accused of [a] crime and put to the onerous task of defending himself from such accusations, the State must convince a Grand Jury composed of the accused’s peers that there exists sufficient evidence and legal reason to believe the accused guilty” (People v Iannone, 45 NY2d 589, 594; see also, People v Lancaster, 69 NY2d 20, 25, *51 cert denied 480 US 922). It has been recognized that the Grand Jury performs a dual role — to investigate in order to ascertain if there is sufficient evidence to accuse one of a crime and to protect persons "from needless and unfounded prosecutions” (People v Lancaster, supra, at 25). Thus, the Court of Appeals observed in People v Brewster (63 NY2d 419, 422): "A Grand Jury proceeding is not intended to be an adversary proceeding, except to the limited extent that CPL 190.50 (subds 5, 6) gives a defendant or person about to be charged the right to testify and to request that persons designated by him or her be called to testify.”
Similarly, the prosecutor serves a dual role as both advocate and public officer and, insofar as relates to his conduct of the Grand Jury proceeding, he is charged not only with a duty to secure an indictment, but also to see that the proceedings are conducted fairly and that justice is done. (People v Lancaster, supra, at 26; People v Pelchat, 62 NY2d 97, 105; People v Smays, 156 Misc 2d 621 [Sup Ct, NY County, Rothwax, J.].) He is a public officer and, in his quasi-judicial role, "he owes a duty of fair dealing to the accused and candor to the courts” (People v Pelchat, supra, at 105; see also, People v Curry, 153 Misc 2d 61, 63; People v Davis, 119 Misc 2d 1013, 1016). As was observed in People v Lofton (81 Misc 2d 572, 575): "The District Attorney is a public officer. His duties are quasi-judicial in nature. His obligation is to protect, not only the public interest, but also the rights of the accused. In the performance of his duties, he must not only be disinterested and impartial, but must also appear to be so.”
Consistent with this duality of purpose and function, "it is incumbent upon the District Attorney to maintain an even-balanced approach to soliciting the relevant facts” (People v Davis, supra, at 1020), far different from the adversarial posture which he assumes at trial. As was held in Davis, in terms of the Grand Jury, since his primary duty is to see that justice is done, his principal goal should be to elicit facts for the grand jurors’ consideration, not to be "predisposed to proving the defendant’s guilt before the Grand Jury” (119 Misc 2d, at 1016). Any other approach would be inconsistent with the principle of fairness and due process which should attend Grand Jury proceedings.
Plainly, the prosecutor’s role as public officer carries with it an obligation of good faith and fair dealing vis-á-vis the accused. Upon this basis, it has been held that a prosecutor must instruct a Grand Jury as to exculpatory but not mitigat *52 ing defenses (see, People v Lancaster, supra, 69 NY2d, at 26; People v Valles, 62 NY2d 36, 38; People v Pelchat, supra; People v Curry, supra, 153 Misc 2d, at 65). Such disclosure is critical in terms of preserving and safeguarding the underlying integrity of the Grand Jury process. Moreover, since this is not an adversary proceeding, he may not assume an adversarial role. His function is to elicit facts, consistent with the fact-finding and investigatory role of the Grand Jury, not prove the defendant’s guilt.
In my view, the District Attorney in this case did not proceed in a manner consistent with that function. The cross-examination was blatantly hostile, to the point of being abusive. In response to defendant’s simple statement, amounting to a denial that he knew decedent or had ever been in his office, the prosecutor went right for the jugular, repeatedly inquiring as to his prior criminal record, which consisted of misdemeanors, and, based upon that record, suggesting a propensity toward committing violent acts upon strangers. This was improper, inflammatory and highly prejudicial (cf., People v Smays, supra).
Plainly, the prosecutor was out to prove his case and to wholly discredit the defendant, not to elicit facts for the grand jurors’ consideration (see, People v Davis, supra). While this might be approved, if not applauded in terms of a tactic at trial, it is improper in relation to a Grand Jury proceeding. It effectively nullified the exercise of defendant’s statutory right to testify and, in my view, amounted to prosecutorial misconduct which so infected the integrity of the Grand Jury process as to require dismissal of the indictment, with leave to the People to re-present (see, People v Patti, NYLJ, Nov. 3, 1986, at 15, col 3 [Sup Ct, NY County, Arber, J.]).
Moreover, compounding the misconduct by the prosecutor here were the instructions on the law, which were materially inadequate and incomplete, especially in relation to the facts and the nature of the case. While the law is clear that "a Grand Jury need not be instructed with the same degree of precision that is required when a petit jury is instructed on the law,” the District Attorney must provide the Grand Jury "with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime.” (People v Calbud, Inc., 49 NY2d 389, 394-395; see also, People v Morales, 183 AD2d 570, 571.)
*53 As was recognized in People v Valles (62 NY2d 36, supra), an instruction is necessary with respect to anything which might result in a finding of no criminal liability. This was not done in this case. The proof before the Grand Jury reflected that Mr. Miller lingered for more than two years before he died in December 1991. As a result of the injuries, surgical procedures were required to reconstruct the esophagus from a portion of the intestine. The result was an insufficiency in communication between the trachea and the esophagus, which led to secretions and saliva entering the lung, leading to recurrent bouts of bacterial pneumonia. Both doctors testified that the immediate cause of death was pneumonia.
Nevertheless, under the unusual circumstances of this case, in view of the cause of death and the length of time between the criminal act and the death, the Grand Jury should have been instructed as to causation in such manner to permit reasonable persons to determine whether the alleged criminal act was a "sufficiently direct cause" of the decedent’s ensuing death from pneumonia to warrant imposition of criminal liability (People v Stewart, 40 NY2d 692, 697, citing People v Kibbe, 35 NY2d 407, 413; see also, People v Griffin, 80 NY2d 723; People v Kane, 213 NY 260, 269-270). In my view, the omission of such an instruction is fatal, since it did not afford the grand jurors enough information to enable them to intelligently decide a critical element of the crime, namely, the causal relationship between the decedent’s death and the criminal act committed over two years earlier.
Upon the foregoing grounds, the indictment (No. 1558/92) must be dismissed, without prejudice to the People, if so advised, to resubmit the charges to another Grand Jury. Accordingly, in view of the dismissal, the cross motion to consolidate the indictment with the earlier indictment for attempted murder (No. 2697/90) is denied as academic. In doing so, the court has not reached the underlying merits presented on the motion to consolidate or for a joint trial.