OPINION OF THE COURT
Harold J. Rothwax, J.
The defendant Newspaper and Mail Deliverers’ Union of New York and Vicinity (hereinafter NMDU) has been indicted for a single count of enterprise corruption (Penal Law § 460.20) based on 81 pattern acts committed by individual unindicted NMDU officers, members, or agents acting together and with other unindicted co-conspirators who worked for the distribution departments at two newspaper companies and an independent distribution company with which the NMDU had collective bargaining agreements or who operated nonunion "bootleg” companies with which the NMDU had no such agreements. Several of the unindicted co-conspirators, including some union members, are alleged to have ties to organized crime. The same Grand Jury which indicted the NMDU voted two separate indictments charging the various individual actors with enterprise corruption and/or the substantive crimes which make up 71 of the 81 pattern acts charged in the indictment against the NMDU.
The NMDU moves to dismiss the indictment as based on legally insufficient evidence to establish the liability of the labor union for the criminal acts alleged and as defective *793 because the instructions on the union’s liability were incorrect and inadequate. (CPL 210.20 [1] [a], [b], [c]; 210.35 [3], [5].) This is apparently the first time a labor union has been charged with criminal conduct as a person under New York law.
Enterprise corruption is defined by Penal Law § 460.20:
"1. A person is guilty of enterprise corruption when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he:
"(a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity * * *
"2. For purposes of this section, a person participates in a pattern of criminal activity when, with intent to participate in or advance the affairs of the criminal enterprise, he engages in conduct constituting, or, is criminally liable for pursuant to section 20.00 of this chapter, at least three of the criminal acts included in the pattern”.
A labor union is an artificial entity which cannot act except through individuals. Therefore, for the NMDU to be prosecuted for enterprise corruption, it must be held vicariously liable for acts committed by its officers, members, or agents. The first issue is whether a labor union may ever be prosecuted as an artificial person for crimes defined by the Penal Law and, if so, whether the NMDU may be prosecuted for enterprise corruption.
Penal Law § 10.00 (7) defines "person” as "a human being, and where appropriate, a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality.” This statute clearly states the legislative intent that an unincorporated association, such as a labor union, may be criminally liable under New York law. However, while the Legislature enacted a statute defining the scope of a corporation’s criminal liability (Penal Law § 20.20), it did not enact a statute defining the scope of an unincorporated association’s criminal liability. This statutory lacuna has made it difficult if not impossible for the prosecution in this case to instruct the Grand Jury on the correct legal theory for a union’s criminal liability and to do so in a meaningful way. Indeed, the NMDU’s main argument is that the failure of the Legislature to enact a statute defining the criminal liability of an unincorporated association demonstrates the Legislature’s intent to exclude such associations from criminal liability, *794 notwithstanding the inclusion of unincorporated associations in the Penal Law definition of "person”. This interpretation is erroneous.
The general rules of statutory construction require that a statute " 'must be read and given effect as it is written by the Legislature’ ” and in accordance with the natural and ordinary meaning of the words. (Parochial Bus Sys. v Board of Educ., 60 NY2d 539, 548 [1983], quoting Lawrence Constr. Corp. v State of New York, 293 NY 634, 639 [1944]; McKinney’s Cons Laws of NY, Book 1, Statutes §§ 92, 94.) "In the course of construing a statute the court must assume that every provision thereof was intended for some useful purpose”. (McKinney’s Cons Laws of NY, Book 1, Statutes § 144; see, People v Gaskins, 171 AD2d 272, 279 [2d Dept 1991].) The Penal Law’s definition of most substantive crimes, including enterprise corruption, begins with the language "[a] person is guilty of’. Therefore, contrary to the defendant’s claim, the inclusion of unincorporated associations within the definition of "person” evidences the clear intent of the Legislature that such associations may be liable for crimes defined by the Penal Law.
The failure to enact a statute defining the scope of the penal liability of an unincorporated association does not defeat the clear intent that liability be imposed. Every entity defined as a person under the Penal Law may be held liable "where appropriate” for criminal conduct defined by the Penal Law, except where such entity is specifically excluded from liability by the language of a specific penal statute. (See, Penal. Law § 135.60 [6]; § 155.05 [2] [e] [vi]; § 215.50 [3] [excluding certain labor union activity from the purview of coercion, extortion, and contempt statutes]; People v Vizzini, 78 Misc 2d 1040 [Sup Ct, NY County 1974].)
The determination of whether it is "appropriate” to prosecute the NMDU as a person for enterprise corruption turns on two factors: whether a labor union is the type of unincorporated association for which the imposition of criminal liability is appropriate, and whether enterprise corruption is the type of crime for which a labor union may appropriately be held accountable. In the commentary to section 2.07 of the Model Penal Code (1985 ed), upon which the Penal Law is based in part, a distinction is made between "highly organized business associations operating entirely for the purpose of the economic gain of its members” for which "the same considerations justifying corporate responsibility might apply” and "loosely formed societies organized for social, religious, and charitable *795 purposes to which such considerations will have no application.” (Id., at 344.) A labor union is of the former type. Therefore, a modern labor union is an appropriate type of unincorporated association for imposition of criminal liability upon the association as a person.
Enterprise corruption (Penal Law § 460.20) is also an appropriate crime for the imposition of liability upon a labor union. Nothing in the enterprise corruption statute exempts a labor union from prosecution for this crime. In the legislative findings section of the Organized Crime Control Act (OCCA) (Penal Law § 460.00), of which the enterprise corruption statute is a part, the Legislature articulated that the purpose of the OCCA is not to "define what organized crime is” but to "define and criminalize what organized crime does.” The Legislature specifically identified "labor racketeering” as one of the ways in which organized crime is operating in New York and concluded that: "The money and power derived by organized crime through its illegal enterprises and endeavors is increasingly being used to infiltrate and corrupt businesses, unions and other legitimate enterprises and to corrupt our democratic processes. This infiltration takes several forms with legitimate enterprises being employed as instrumentalities, injured as victims, or taken as prizes. Through such infiltration the power of an enterprise can be diverted to criminal ends, its resources looted, or it can be taken over entirely, either on paper or de facto. Thus, for purposes of making both criminal and civil remedies available to deal with the corruption of such enterprises, the concept of criminal enterprise should not be limited to traditional criminal syndicates or crime families, and may include persons who join together in criminal enterprise * * * for the purposes of corrupting such legitimate enterprises or infiltrating and illicitly influencing industries.” (Penal Law § 460.00.)
A labor union which is alleged to have been heavily infiltrated by organized crime to the point where many of its senior officers, members and agents are engaging in an organized pattern of criminal conduct in their daily conduct of union business cannot escape liability simply because the union is a legitimate association which includes many individual members who are not themselves criminals or affiliated with any organized crime activity. When a labor union has permitted itself to become the instrumentality of a criminal enterprise and its officers, members, or agents are conducting a significant portion of the union’s daily business through a pattern of *796 criminal activity for the purpose of illicitly influencing the industry within which the union operates, the labor union itself may be prosecuted as a member of the criminal enterprise, provided that the People can prove the requisite level of involvement sufficient to impose criminal liability on the organization as an entity. Nothing in this ruling detracts from the responsibility of the individual union officers, members, or agents for enterprise corruption or for the substantive crimes comprising the pattern acts (see, People v Sakow, 45 NY2d 131 [1978]).
While not controlling over New York law, the rules developed by Federal courts for determining when a labor union may be found in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 USC § 1961 et seq.), upon which the OCCA is based, also support this conclusion. To avoid penalizing a union which is really the victim of organized criminal activity, Federal courts require proof that the union is an "aggressor entity” that is a central figure in the criminal enterprise and not merely a "conduit” that unknowingly facilitated the criminal activity. (Haroco, Inc. v American Natl. Bank & Trust Co., 747 F2d 384, 401 [7th Cir 1984], affd 473 US 606 [1985]; Amendolare v Schenkers Intl. Forwarders, 747 F Supp 162, 168-169 [ED NY 1990]; Gruber v Prudential-Bache Sec., 679 F Supp 165, 180 [Conn 1987].) This determination turns on a number of factors, chief among them the complicity of high level officers. "What constitutes a 'central figure’ will vary with the factual circumstances of each case * * * it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high corporate level has been determined, the court may then consider other factors, among them the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefitted from the racketeering activity.” (Gruber v Prudential-Bache Sec., 679 F Supp, supra, at 181.)
In this case, the indictment alleges that one union president, three business agents, several chapel chairmen, and several foremen and assistant foremen (company employees, required to be union members, who were agents of the union with responsibility for enforcing the terms of the collective bargaining agreement) acted together in smaller groups within *797 the hierarchy of the criminal enterprise to commit several criminal schemes. The schemes included one in which the companies paid wages and union dues for employees who actually did no work; several varieties of returns schemes, in which the numbers of returned papers were inflated, the companies paid for returned papers for which they had given the distributor a credit, or papers given as free samples were returned for a full refund; a scheme to sell or give union cards to persons associated with the criminal enterprise who did not have sufficient seniority for membership; a scheme to steal seniority rights by placing an unqualified enterprise associate on the highest union seniority list after he was fired from an assistant foreman position; several schemes by which delivery work which should have been done by NMDU members was diverted to nonunion distributorships; and the theft of strike relief fund money provided by a different union. None of these schemes would have been possible without the complicity of the NMDU. Moreover, the NMDU directly benefitted from some of the schemes in the form of union dues paid by the distribution companies for no-show employees and induction fees and union dues paid by persons who were granted union cards without sufficient seniority. The union also benefitted in part from the schemes to divert delivery to nonunion companies because a dues-paying union driver was utilized in each case to drive at least one leg of the delivery route. The union benefitted from the theft of strike fund moneys because a significant portion of the money was diverted to a union business agent for the purpose of funding acts of strike violence. Because the NMDU meets the Federal definition of an "aggressor entity” it is appropriate to prosecute it as a person for enterprise corruption. (Cf., Volmar Distribs. v New York Post Co., 899 F Supp 1187, 1190-1196 [SD NY 1995] [finding the NMDU not at fault in a civil RICO action due to lack of proof that it benefitted from a scheme run by its president to secure distribution rights for particular companies in exchange for bribes and through extortion].)
Turning to the adequacy of the Grand Jury instructions to establish the NMDU’s liability for enterprise corruption, the court has reviewed the instructions and determined that the prosecution correctly instructed the Grand Jury on the elements of the pattern acts and the elements of enterprise corruption. The instructions were sufficiently detailed to provide meaningful assistance to the Grand Jury in applying the complex legal definitions contained in the enterprise corrup *798 tion statute to the evidence before them. The prosecutor made some effort to explain how an individual defendant might be employed by or associated with a criminal enterprise and how an individual might participate in a pattern of criminal activity.
The prosecutor’s charge on the NMDU’s liability, however, stands in stark contrast. The prosecutor stated:
"In considering the union’s liability, you must be aware of the following two statutes:
"Penal Law Section 10.00 subsection seven defines a person to include or [where?] appropriate, quote, an unincorporated association, unquote.
"Labor Law Section 807 subsection six provides that, quote, no association or organization participating in — participating or interested in a labor dispute shall be held responsible in any criminal prosecution, [for] the unlawful acts of the individuals, officers, members or agents except upon proof by weight of the evidence and without the aid of any presumptions of law or fact of (a) the doing of such acts by persons who are officers, members, or agents of any such association and (b) the actual participation in or actual authorization of such acts or ratification of such acts after actual knowledge thereof by such association or organization.
"For the purposes of this grand jury, I charge you that with respect to the acts charged in this indictment, the NMDU is, quote, an association or organization participating and interested in a labor dispute, end quote, and so, in order to vote an indictment in addition to all of the other requirements that I’ve charged you about earlier today and in the past, you must find that this section that I just read to you is also satisfied.” (Grand Jury transcript, at 4087-4088.)
No other instructions were offered on the critical issue of the NMDU’s liability. One of the most important determinations to be made by a Grand Jury is whether there exists reasonable cause to believe that the accused committed the charged crimes. (GPL 190.65 [1] [b].) This charge did not permit the jury intelligently to make that determination.
The prosecutor’s charge to the Grand Jury need not be as complete or detailed as a Judge’s charge to the petit jury, but it must give guidance adequate for the Grand Jury intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime. (People v Calbud, Inc., 49 NY2d *799 389 [1980]; People v Valles, 62 NY2d 36 [1984].) In most cases, the prosecutor’s obligation to instruct a Grand Jury may be met by reading the appropriate sections of the Penal Law defining the crime. (People v Calbud, Inc., 49 NY2d, supra, at 395, n 1.) However, in some situations, the instructions to the Grand Jury may be so misleading, incomplete, or confusing as to substantially undermine the integrity of the proceedings. In those cases, the indictment must be dismissed even where it is supported by legally sufficient evidence. (People v Calbud, Inc., 49 NY2d, supra, at 394-395; People v Valles, 62 NY2d, supra, at 38; People v Caracciola, 78 NY2d 1021, 1022 [1991]; People v Batashure, 75 NY2d 306, 311-312 [1990].) The error in the Grand Jury charge must be so significant as to create the possibility of prejudice to the defendant but need not establish actual prejudice. (People v Sayavong, 83 NY2d 702, 709 [1994]; People v Wilkins, 68 NY2d 269, 276-277 [1986].) "Dismissal of indictments under CPL 210.35 (5) should thus be limited to those instances where prosecutorial wrongdoing, fraudulent conduct or errors potentially prejudice the ultimate decision reached by the Grand Jury.” (People v Huston, 88 NY2d 400, 409 [1996].)
The chief difference between the indictment of the NMDU and the indictment of the individual perpetrators, which the Grand Jury had voted immediately before being instructed on the law regarding the NMDU indictment, was the definition of the union’s liability for the acts of those individual perpetrators. This situation rendered it critical that the Grand Jury be given complete and accurate legal instructions on the standard for imposing criminal liability on a labor union. The failure to define the terms "actual participation”, "actual authorization”, and "ratification * * * after actual knowledge of’ the acts perpetrated by the individual union officers, members, or agents precluded the grand jurors from intelligently evaluating the facts before them on the issue which lies at the very heart of the decision to vote the indictment — the determination that the defendant labor union was responsible for the criminal conduct charged in the indictment. (See, CPL 190.65 [1] [b].)
The meaning of these terms is not intuitively obvious. The terms are taken from the Norris-LaGuardia Act (29 USC § 106), upon which Labor Law § 807 (6) is based, and are similar to the terms of other "little Norris-LaGuardia” statutes adopted by other States. As interpreted by the courts, none of these terms require an actual vote by the membership of the union *800 authorizing in advance the actions or formally approving of them after the fact. Nor is actual participation of the union limited to situations in which the entire union or a large portion of it participates in the illegal activity.
Courts have found "actual participation” by a labor union where union officials personally take part in the unlawful acts, and after evaluating factors such as the number of union participants, their status within the union, the extent of the union’s knowledge of the actions, and its power to control them. (Freeport Transp. v International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, 523 Pa 491, 496-497, 568 A2d 151, 153, cert denied 498 US 899 [1990]; United Aircraft Corp. v International Assn. of Machinists, 161 Conn 79, 88-89, 285 A2d 330, 337-338, cert denied 404 US 1016 [1972].) Mass picketing may be sufficient to establish actual participation. (See, Nathan’s Famous v Local 1115, 70 Misc 2d 257 [Sup Ct, Kings County 1972].)
"Actual authorization” may be established where the unlawful acts, or acts generally of the same type and quality, were expressly authorized by the union, either in a formal meeting or vote or by an informal order of the union leadership. (Brotherhood of Carpenters v United States, 330 US 395 [1947]; Gajkowski v International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, 519 Pa 320, 340-343, 548 A2d 533, 543-544 [1988], cert denied sub nom. Gajkowski v Highway Truck Drivers & Helpers Local Union No. 107, 490 US 1022 [1989]; United Aircraft Corp.v International Assn. of Machinists, 161 Conn 79, 88-89, 285 A2d 330, 337, supra.) Authorization may also come from the grant of plenary authority to act on the union’s behalf for a specific purpose, such as empowering a specific union official to conduct a strike and to discipline the participants. (Browne v International Bhd. of Teamsters, 203 AD2d 13, 15 [1st Dept 1994]; Yellow Bus Lines v Drivers, Chauffeurs & Helpers Local Union 639, 883 F2d 132, 136-137 [DC Cir 1989], reh in part 913 F2d 948 [DC Cir 1990], cert denied 501 US 1222 [1991]; see, Brotherhood of Carpenters v United States, 330 US, supra, at 406 [liability may attach upon clear proof that particular act charged is one which necessarily flows from authority granted by the union].) Authorization may also be inferred from the actual participation by a large number of union members, such as in a case of mass picketing. (Nathan’s Famous v Local 1115, 70 Misc 2d, supra, at 259.)
"Ratification” requires direct or circumstantial evidence establishing that the union approved of the unlawful acts after *801 learning of them, such as by failing to discipline the perpetrators, or by providing legal counsel, paying bail bonds, or paying criminal fines for perpetrators arrested for such acts, or where the union participated actively or by knowing tolerance in further acts which were themselves actionable or which drew upon the prior violence for their force. (Mine Workers v Gibbs, 383 US 715 [1966]; United Aircraft Corp. v International Assn. of Machinists, 161 Conn 79, 88, 285 A2d 330, 337, supra ["The proof must be of a ratification knowingly made in express and direct acts or terms of assent to the acts complained of by the organization to be charged”].) In Yellow Bus Lines (supra), the court ruled that the local union ratified by knowing tolerance the violence perpetrated by the union official designated to direct a strike on behalf of the union because the union was informed early in the strike of the official’s wrongful acts but took no action to remove or discipline the official. (Yellow Bus Lines v Drivers, Chauffeurs & Helpers Local Union 639, 883 F2d, supra, at 136; see, Bonanno Linen Serv. v McCarthy, 708 F2d 1, 11-12 [1st Cir], cert denied 464 US 936 [1983]; Airco Speer Carbon-Graphite v Local 502, 494 F Supp 872, 877 [WD Pa 1980] ["the acts of an agent can be ratified by inaction which manifests consent”].)
The deficiency in the charge in this case substantially undermined the integrity of the Grand Jury proceeding and created the strong possibility that the NMDU was indicted merely because many of its officers, members, or agents had been involved in the commission of the 81 pattern acts alleged in the indictment, and without any evaluation of whether their participation was sufficient to establish that the union as a whole had participated in the crimes, or had authorized or ratified their conduct, thereby prejudicing the NMDU. (People v Darby, 75 NY2d 449, 454-455 [1990]; CPL 210.35 [5].) Where the Grand Jury has not been instructed on critical terms necessary for their evaluation of the case, the indictment is defective and cannot stand. (See, People v Ramos, 223 AD2d 495 [1st Dept 1996] [failure to define necessary legal concept of "residence”]; People v Jones, 157 Misc 2d 45 [Sup Ct, Queens County 1993] [failure to instruct on causation and proximate cause where victim died of pneumonia two years after poisoning]; People v Wakefield Fin. Corp., 155 Misc 2d 775 [Sup Ct, NY County 1992] [failure to charge constructive possession and circumstantial evidence]; People v McCloud, NYLJ, May 12, 1992, at 27, col 3 [lack of appropriate instruction on physical injury].) Therefore, the indictment against the NMDU is defective and must be dismissed.
*802 Moreover, even if the bare bones charge could be found to comply with the prosecutor’s duty to instruct a Grand Jury meaningfully on the law, the indictment would still have to be dismissed because the prosecution utilized the wrong legal standard in defining a labor union’s liability under New York law.
Despite its charge to the Grand Jury, the prosecution has argued that, in the absence of State law defining a union’s culpability for enterprise corruption, the Federal rules governing a union’s liability under RICO should control. This argument is rejected because the Federal law governing a union’s liability in general is at odds with New York State law and provides far less protection to a union than does New York law.
The United States Supreme Court ruled in 1922 that a labor union was an artificial entity subject to the doctrines of agency and respondeat superior, making a union liable for the civil and criminal bad acts of its members. (United Mine Workers v Coronado Co., 259 US 344 [1922].) It is in the framework of this concept of a labor union’s responsibility for the acts of its officers, agents, and members that Federal courts have adopted rules for determining when a labor union may be prosecuted for RICO violations. (See, e.g., Cox v Administrator United States Steel & Carnegie, 17 F3d 1386, mod on reh 30 F3d 1347 [11th Cir 1994], cert denied sub nom. Cox v USX Corp., — US —, 115 S Ct 900 [1995].) New York, by contrast, still adheres to the common-law rule that an unincorporated association is not an artificial person and that no agency relationship exists between the members of such associations, including labor unions. (Martin v Curran, 303 NY 276 [1951].) A labor union is, therefore, not liable in New York for illegal conduct committed by officers, members, or agents unless it can be established that every member individually authorized or ratified the wrongful act. (Martin v Curran, 303 NY, supra, at 282; Giffords Oil Co. v Boss, 54 AD2d 555 [2d Dept 1976]; Saint v Pope, 12 AD2d 168, 171-172 [4th Dept 1961]; Price v International Bhd. of Teamsters, NYLJ, Jan. 13, 1994, at 28, col 5.) The Martin Court held that this rule was mandated by the absence of a statute abrogating the common law, stating that, "for better or worse, wisely or otherwise, the Legislature has limited such suits against association officers, whether for breaches of agreements or for tortious wrongs, to cases where the individual liability of every single member can be alleged and proven.” (Martin v Curran, 303 NY, supra, at 282.)
*803 Applying the Court of Appeals rationale to the issue of a labor union’s liability as a person for criminal conduct, this court cannot, in the absence of a penal statute to the contrary, interpret the Penal Law as imposing more liability on a union for the criminal conduct of its officers, members, or agents than is imposed for their tortious conduct. To do so would make it easier to convict a labor union of a crime than to successfully sue that union in civil court. Therefore, a labor union may not be indicted for crimes committed by its officers, members, or agents except upon legally sufficient proof establishing that the union membership as a whole authorized or ratified the specific criminal acts alleged.
The conclusion that the Martin no-agency rule applies to the NMDU’s criminal responsibility also precludes the use of Penal Law § 20.20, defining corporate criminal liability, as an analogue for defining union liability in a criminal prosecution. The People have argued that, once it is determined that a labor union may be criminally liable at all, the labor union must act through its agents just as a corporation does. However, the conclusion that a labor union may be criminally responsible as a person under New York law, and the fact that a labor union may act only through individual officers, members, or agents, does not dictate that the union’s criminal liability is based on the agency principles applicable to corporate criminal liability in New York. This is true even though the statute defining corporate criminal liability has been applied to partnerships, which are treated identically with unincorporated associations under the Penal Law — defined as a person for the application of penal statutes, but without any statutory definition of the scope of that personal liability. (People v Smithtown Gen. Hosp., 92 Misc 2d 144 [Sup Ct, Suffolk County 1977].) While a similar adaptation of Penal Law § 20.20 to a labor union might appear to be a rational approach to the issue of liability in this case, such an interpretation cannot be justified under New York law. For, unlike the case of an unincorporated association, New York law recognizes that the agency doctrine applies to partnerships. (Partnership Law §§ 20, 24.) Therefore,'Penal Law § 20.20, founded as it is in agency principles, cannot provide a basis for a labor union’s criminal liability.
The prosecution argues that it chose to rely on Labor Law § 807 (6) for the definition of a union’s liability for two reasons: it is the only statute which appears to pertain to the liability of a labor union for criminal acts and it provides a more stringent standard for liability than Penal Law § 20.20. *804 Neither rationale convinces the court that it is, in fact, the correct standard for an unincorporated association’s criminal liability in this State.
Read in isolation, Labor Law § 807 (6) seems to govern all criminal suits against a union. The statute states that "no association or organization participating or interested in a labor dispute * * * shall be held responsible or liable in any civil action at law or suit in equity, or in any criminal prosecution”. (Labor Law § 807 [6].) However, section 807 of the Labor Law governs the granting of injunctions against labor unions during labor disputes. It was not enacted together with the Penal Law and is not referenced in the Penal Law as defining a labor union’s liability for criminal conduct. Moreover, notwithstanding the equally broad language of Labor Law § 807 (6) as controlling "any civil action”, the First Department has ruled that the statute has no application outside of the determination of whether an injunction should be granted against a union during a labor dispute and did not define the labor union’s liability for injuries sustained by a security guard escorting a truck through a picket line. (Browne v International Bhd. of Teamsters, 203 AD2d, supra, at 14-15.) Federal courts have also ruled that Labor Law § 807 (6) does not define the substantive liability of a labor union under New York law for the tortious acts of its members during labor disputes, holding that the Martin no-agency rule applies to pendant State tort claims brought against labor unions in Federal court. (Modeste v Local 1199, 850 F Supp 1156 [SD NY], affd 38 F3d 626 [2d Cir 1994]; R.M. Perlman Inc. v New York Coat, Suit, Dresses, Rainwear & Allied Workers’ Union Local 89-22-1, 789 F Supp 127, 133 [SD NY 1992].) Therefore, this statute cannot provide the definition of a labor union’s liability for any substantive criminal act committed by a union officer, member, or agent.
Even if Labor Law § 807 (6) were found to have some applicability outside of the granting of injunctions, its application is limited to a labor union that is "participating * * * in a labor dispute”. The vast majority of the pattern acts charged in the instant indictment did not occur during a labor dispute. Every action taken by a union officer, agent or member bound by the terms of a collective bargaining agreement, even actions which contravene those terms, does not implicate a labor dispute. (See generally, Barclay’s Ice Cream Co. v Local No. 757, 41 NY2d 269 [1977], cert denied 436 US 925 [1978].)
Labor Law § 807 (10) (c) defines a labor dispute as: "[A]ny controversy concerning terms or conditions of employment, or *805 concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the relation of employer and employee.” This definition requires a controversy between the union and the employer or prospective employer, or between members of the union, over the terms of the agreement, a condition of employment, or the representation of the union. It does not apply when no such controversy exists.
When determining whether labor activity is conducted within the context of a labor dispute, Federal courts consider whether the employee-employer relationship forms the matrix of the dispute, regardless of the parties involved. This case does not involve any disagreement about the terms and conditions of employment relations and is not a controversy arising out of the respective interests of employer and employee. It involves only an attempt by the State of New York to penalize the union for conducting its daily affairs through a pattern of criminal activity designed to financially benefit the individual enterprise members, including the union. Although many of the pattern acts involved conduct over which there was some disagreement within the union, internal union differences over how union officials are enforcing the terms of a collective bargaining agreement are not labor disputes within the definition of the Labor Law unless they take the form of concerted labor action, such as picketing to convince a company to renew an agreement that work contracted out by the company would be given to shops organized by a particular union. (See, e.g., Jou-Jou Designs v International Ladies Garment Workers Union, 643 F2d 905, 911 [2d Cir 1981].) The majority of the pattern acts charged in this indictment involved no concerted labor activity at all and were wholly unrelated to the concerns of labor-management relations or the terms and conditions of employment.
Most importantly, application of Labor Law § 807 (6) to define a labor union’s liability for violations of the Penal Law would establish a more liberal definition of a labor union’s liability than the common-law rule of no agency articulated in Martin (supra) and would, therefore, expose a labor union to more liability for criminal acts committed in New York than imposed for civil wrongs. The Martin rule limits union liability to two situations: the authorization or the ratification of *806 conduct by the union membership. It might be argued that these requirements are effectively identical to the "actual authorization” or "ratification * * * after actual knowledge” standards of Labor Law § 807 (6), which, as discussed above, may be proven by circumstantial evidence and do not require a vote of the entire membership. The problem with this argument is that all of the courts interpreting these terms were doing so with the understanding that the Norris-LaGuardia Act embodies a somewhat restricted version of agency liability, limiting the union’s liability to actions of which it was aware and which it approved. The limitation of the agency principles encompassed by these terms was intended to prevent a labor union from being held responsible for the acts of a few rogue individuals, infiltrators, or saboteurs merely because the individuals were union members participating in a strike authorized by the union. (Brotherhood of Carpenters v United States, 330 US, supra, at 403-406; Aguirre v Automotive Teamsters, 633 F2d 168 [9th Cir 1980].) It is therefore not clear that the case law defining authorization or ratification under the Norris-LaGuardia Act or similar statutes has any real application when the focus of the determination is whether the entire union membership authorized or ratified the criminal acts.
In addition, the Martin rule does not include a concept similar to "actual participation” by the union, which courts have interpreted to apply beyond situations where the entire membership of the union commits the act. While a union could unquestionably be responsible, without the resort to agency principles, for a crime in which every one of its members participated, courts interpreting the meaning of "actual participation” have interpreted it according to agency principles, finding that a union’s actual participation in a criminal act may be established by considering the number of union members involved in the act and their positions of authority within the union, as well as the union’s knowledge of the acts and its ability to control them. (Freeport Transp. v International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers, 523 Pa, at 496-497, 568 A2d, at 153, supra; United Aircraft Corp. v International Assn. of Machinists, 161 Conn, at 88-89, 285 A2d, at 337-338, supra.) Thus if more than one high ranking union official participated in or supervised the wrongful act, the union itself may be found to have actually participated in the act. Similarly, actual participation may be predicated upon a union president’s or executive board’s formal or informal order *807 for union members to commit a criminal act. (Gajkowski v International Bhd. of Teamsters, Chauffers, Warehousemen & Helpers, 519 Pa, at 340-343, 548 A2d, at 543-544, supra.) Neither definition can be reconciled with the concept that the union’s liability is that of each member individually. No such limitation was placed on the term in the charge to the Grand Jury, leading to the strong possibility that the indictment in this case is founded upon the Grand Jury’s misunderstanding of the extremely restricted application of the concept of a labor union’s actual participation in a criminal act under New York law. Therefore, the NMDU may have been prejudiced by the incomplete or incorrect charge and the indictment cannot stand.
The liability of a labor union as a person under the Penal Law is that of a labor union in a State civil action. To establish a labor union’s liability for a crime committed by any officer, agent or member, the prosecution must establish that every member of the union authorized or ratified the criminal act or that every union member actually participated in the act. This imposes a very difficult burden upon the prosecution and may well preclude the criminal prosecution of a labor union in most cases. Nevertheless, until the Legislature enacts a statute clearly imposing agency liability upon a labor union for the criminal acts of its agents, a trial court may not impose such liability. Even if a labor union as an entity is shielded from criminal liability by this standard, the officers, members, or agents who commit the substantive crimes involved can, as was done in this case, be prosecuted as individuals for those crimes. The indictment is dismissed with leave to re-present the case to another Grand Jury.