[683 NYS2d 488]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v NEWSPA-PER AND MAIL DELIVERERS' UNION OF NEW YORK AND VICINITY, Respondent.

First Department, December 3, 1998

### APPEARANCES OF COUNSEL

*Eleanor J. Ostrow* of counsel (*Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*B. Anthony Morosco* for respondent.

### OPINION OF THE COURT

TOM, J.

This case arises from a widespread investigation into corruption in the Newspaper and Mail Deliverers' Union of New York and Vicinity. The Union, an unincorporated association, controls the distribution and delivery of newspapers, magazines and periodicals in the New York Metropolitan area. The Union has collective bargaining agreements with the New York Times, the Daily News, the New York Post, El Diario and the Metropolitan News Company, many of whose employees are Union members.

The investigation, as set forth in the indictment, revealed several illegal schemes operated by the Union's officers, members and agents, including organized crime associates, as well as employees of the newspaper companies. A brief overview will suffice to place the issues in context. The Union leadership maintained allegedly fictitious employees on the Union books, for whom target employers would pay wages and Union fees as per collective bargaining agreements. In order to maintain the fiction, duly appointed foremen had to conspire

with the Union chapel chairmen (basically shop stewards) who were supposed to monitor payrolls. Others falsified newspaper returns, for which newspaper distribution companies, specifically Metropolitan, would refund thousands of dollars. For this, foremen had to cooperate with the distributors. Some stole newspapers off of the loading docks that would be delivered to "bootlegger" (i.e., non-Union) distributors. Others received bribes from the bootleggers to ensure quiescent labor activity. The bootleggers' very existence depended on cooperation by the Union's business agents who would decline enforcement of the Union's collective bargaining agreements, and by company foremen who would assign Union drivers to make deliveries to the bootleggers. Some paid bribes to newspaper company employees. Some also stole strike funds held in trust for members for the 1990 Daily News strike. The Union's Executive Board, elected by and acting on behalf of the Union, ensured Union membership for confederates who were ineligible for membership under the Union's rules, from whom the Union received dues. The People's theory is that Union members implicitly ratified those decisions. Several foremen and other members received expedited seniority to which they were not entitled, essentially depriving bypassed members of the correlating seniority benefits. Union members who complained about the activities done in the name of the Union were assaulted. Numerous unindicted enterprise members who were Union members also were alleged to be members or affiliates of organized crime.

As a consequence of this investigation, an indictment was filed against the Union charging it with a single count of enterprise corruption under Penal Law § 460.20, predicated on 81 pattern acts allegedly committed by these officers, members and agents in connection with newspaper distribution and various racketeering activities. Several of the individual enterprise members were separately indicted for enterprise corruption as well as for several of the substantive offenses that made up the pattern acts alleged against the Union. The pattern acts include grand larceny arising from the theft of newspapers from loading docks; falsifying business records; conspiracy to falsify business records relating to health insurance, checks issued to phantom members and newspapers stolen from loading docks; conspiracy to commit grand larceny by improperly promoting favored members and thereby stealing the seniority rights of others; commercial bribery; bribery of a Union official; assault in the second degree, accomplished by the time-honored

tradition of using a baseball bat on an uncooperative Union member; coercion; and coercion with the intent to impair the integrity of the Grand Jury.

The individual participants who were separately indicted included: James Galante, allegedly a member of the Bonanno crime family, who pleaded guilty to enterprise corruption; John Vispiano, a New York Post Union foreman, who also pleaded guilty to enterprise corruption and to bribe receiving; Joe Steo, also a New York Post foreman, who pleaded guilty to grand larceny; Michael Diana, a Union business agent, who pleaded guilty to enterprise corruption arising from his theft of strike funds from another union; and Leo D'Angelo, general foreman at Metropolitan News Company, who pleaded guilty to enterprise corruption arising from his participation in a phantom employee scheme, the improper elevation of an employee resulting in the theft of seniority rights from others and his arrangement of an assault on a noncooperating Union member. Two assistant foremen, Jackie Piervencenti and Thomas Carrube, pleaded guilty to perjury. Michael Alvino, the Union president from 1989 to 1991, pleaded guilty to criminal contempt arising from his Grand Jury testimony in connection with his delivery of bribes to another former Union president, Douglas LaChance. LaChance, for his part, had been convicted on a Federal indictment for his receipt of bribes during his tenure as president during the 1970's, a history that did not dissuade voting members from re-electing him to that post in 1991. Nor did Alvino's testimony in the Federal action, conceding his delivery of the bribes to LaChance, similarly dissuade members from electing Alvino in 1989. The facts as alleged in the present indictment portray a corruption sufficiently pervasive to have converted the Union hierarchy into a subterfuge, where the confederacy actually operated the Union for the benefit of the confederates.

The issues as to whether the Union, as an unincorporated association, could be indicted, and whether the Grand Jury instruction on Labor Law § 807 (6), holding unions liable for the acts of their officers, members or agents, under appropriate circumstances, properly communicated the correct principles of law, are presented for review on this appeal. The theory of the prosecution against the Union is that these acts by the indicted individuals were made possible by the Union's complicity.

In presenting the case to the Grand Jury, the prosecutor instructed it on Labor Law § 807 (6), a provision insulating unions in labor disputes from liability for the acts of individual

officers, members or agents, except upon proof of the union's actual conduct, established by proof of "actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof by such association or organization." The prosecutor instructed the Grand Jury that in order to indict the Union, it had to find this section satisfied. The Grand Jury indicted.

When the indictment against the Union was filed, the prosecutor also filed a special information seeking forfeiture of Union property, including contract rights, pursuant to Penal Law § 460.30.

In moving to dismiss the indictment on legal sufficiency grounds, the Union claimed that as an unincorporated association whose putative liability was predicated solely on the purportedly unauthorized acts of its members and agents, it cannot be held liable since such conduct could not be imputed to it. The Union also argues that it was impossible to establish the mental state, in toto, of an unincorporated association, requiring proof of the aggregate mental states of its members. The Union also challenged the Grand Jury instruction as being inadequate to explain the basis of the Union's liability.

The motion court, construing the Union to be a "person" under the Penal Law's general definition of the term, and hence a party covered by the enterprise corruption statute's class of "persons" subject to liability, rejected the Union's challenge to legal sufficiency as a matter of law and also under the facts of the case. To this extent, we agree. However, the court concluded, citing *Martin v Curran* (303 NY 276, 282), that under New York common law, and absent a statute specifically abrogating common law, an unincorporated association could not be guilty for the acts of its members unless all members authorized or ratified the unlawful acts of the erring members (170 Misc 2d 790, 802). Hence, the motion court concluded that the wrong legal principle was applied and dismissed the indictment. The court concluded, correctly, that Labor Law § 807 (6), the statute charged to the jury as the basis for the Union's vicarious liability, applied only to labor disputes and not to the present case, but incorrectly held that the common-law principle pursuant to *Martin v Curran* (*supra*) barred the action in the absence of specific enabling legislation.

The court also generally upheld the Grand Jury instructions defining enterprise corruption and related principles as being "sufficiently detailed to provide meaningful assistance to the Grand Jury in applying the complex legal definitions contained

in the enterprise corruption statute to the evidence before them." (170 Misc 2d 790, 797-798, *supra.*) Here, too, we agree with the conclusion. However, the court found the meaning of " 'actual participation'," " 'actual authorization'," and " 'ratification * * * after actual knowledge'," which it characterized as being "not intuitively obvious," to be insufficiently clear to instruct the grand jurors on how to intelligently evaluate the facts before them on the central issue, the imputation of liability from individuals to the Union (*supra,* at 799). The court found that "[t]he deficiency in the charge * * * created the strong possibility that the NMDU was indicted merely because many of its officers, members, or agents had been involved in the commission of the 81 pattern acts alleged in the indictment, and without any evaluation of whether their participation was sufficient to establish that the union as a whole had participated in the crimes or had authorized or ratified their conduct". We disagree.

Initially, the Union as an entity is within the scope of the enterprise corruption statute. A criminal enterprise includes "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents" (Penal Law § 460.10 [3]). A "person's" guilt of enterprise corruption arises from, *inter alia,* intentional conduct or participation in the affairs of the enterprise by participating in a pattern of criminal activity (Penal Law § 460.20 [1] [a]). Although Penal Law article 460 does not elaborate on what it means by "person," the Penal Law defines a "person" to include an unincorporated association (Penal Law § 10.00 [7]). The Legislature has thereby undermined the core point of *Martin v Curran* (*supra*) upon which the motion court relied—that an unincorporated association cannot be treated as a "person" under the law. Adoption of defendant's position, that unincorporated associations cannot be criminally liable, would render section 10.00 (7) meaningless.

Moreover, imposing criminal liability on a union as a "person" under section 460.20 accords with the legislative findings prefacing article 460 that "[o]rganized crime in New York state involves highly sophisticated, complex and widespread forms of criminal activity" and "continues to expand its corrosive influence in the state through illegal enterprises engaged in such criminal endeavors" (Penal Law § 460.00).The statute

is intended as a vehicle to combat organized crime's infiltration and corruption of unions, to keep them from being "employed as instrumentalities, injured as victims, or taken as prizes. Through such infiltration the owner of an enterprise can be diverted to criminal ends * * * or it can be taken over entirely, either on paper or de facto" (Penal Law § 460.00). The Legislature correlated the prevalence of organized crime with the inadequacy of sanctions and remedies available to grapple with often shadowy structures. Rather than providing precise definitions to terms, the Legislature directed that "definitions should be given their plain meaning * * * in the context of the legislative purposes". Defining a "person" to include this unincorporated association, especially in the context of the Union's subversion by organized crime, is well within the context of article 460's legislative intent. To hold to the contrary would frustrate the purpose of article 460.

Defendant contends that, notwithstanding Penal Law § 10.00 (7), an unincorporated association lacks sufficient cohesion to impose liability on the whole without regard for the aggregate individual actions of its collective associated members. However, a union, and particularly this Union, is not a diffuse, formless collection of people linked only by association, as construed historically, that is the necessary underpinning of defendant's argument. Rather, modern unions are highly structured, hierarchical, business entities that exist to advance the interests of their members.

One salutary effect of broadening the net of liability to include unincorporated associations, under carefully limited circumstances, is to encourage such entities to better police those agents who ostensibly act in furtherance of their association duties (*Jund v Town of Hempstead*, 941 F2d 1271, 1280). The more evolved nature of modern unions brings to mind the observation that racketeering prosecutions historically netted individuals, but, as these individuals were replaced by other corrupt individuals, the corrupt entity usually continued to operate (*see, e.g.*, Goldberg, *Cleaning Labor's House: Institutional Reform Litigation in the Labor Movement*, 1989 Duke L J 903, 907), which leads directly to the legislative findings prefacing Penal Law article 460. The intent of article 460 was to provide a statutory vehicle to indict pervasively corrupt associations, including unions under appropriate circumstances, regardless of their particular legal form. Hence, there is no sound legal basis to insulate from criminal liability an unincorporated, but highly structured and purposefully active, associa-

tion in which corruption is alleged to be pervasive, solely because it is an association.

Nor can the Union avail itself of an observation that its constituent members were actually the ones victimized by a cadre of criminals, thereby somehow exonerating the Union of liability for that victimization. Many members certainly seem to have been victimized, and there was individual culpability, leading to separate indictments, but the culpable individuals acted under the aegis of a particular entity, the Union, whose structure and instrumentalities were the means by which all crimes alleged were carried out. As alleged in the accusatory materials, the acts and intents of these individuals were the acts and intent of the Union.

Nor does the 1951 decision in *Martin v Curran (supra)* state applicable principles of liability. First, *Martin* addressed tort liability, arising out of defamation by a union's journal not specifically ratified by all union members, rather than criminal liability, so that the case was never directly on point. Second, the majority opinion in *Martin,* discussing General Associations Law § 13, found that "for better or worse, wisely or otherwise, the Legislature has limited such suits * * * to cases where the individual liability of every single member can be alleged and proven. * * * [T]his court does not revise statutes * * * to bring the law into accord with modern fact" (*supra,* at 282). The legislative enactment of Penal Law article 460, when read with the definition of person in section 10.00 (7), armed prosecutors to seek indictment of corrupt associations formerly thought to be too inchoate to constitute autonomous entities, and manifestly has "[brought] the law into accord with modern fact." This leads to the third basis for disavowing the application of *Martin* to these facts: its literal application in the current, criminal, context would clearly frustrate the legislative intent behind the enactment of Penal Law article 460. If *Martin's* common-law rule precludes prosecution of this Union under these circumstances, that logic effectively protects a corrupt union from State Racketeer Influenced and Corrupt Organizations Act (RICO) liability and insulates its treasury from State RICO enforcement as to ill-gotten gains notwithstanding compelling legislative declarations to the contrary. Finally, we have not hesitated to discard obsolete common-law doctrines when the needs addressed by the doctrine have become outmoded as a consequence of changed historical circumstances (*see, Adams v New York City Tr. Auth.,* 211 AD2d 285, *affd* 88 NY2d 116).

Turning to the instructions, preliminarily, we do not share the motion court's concern that key terms in Labor Law § 807 were not sufficiently defined to provide direction to the grand jurors in their evaluation of the evidence. To the contrary, rather than referencing obscure legal concepts, they have neither technical nor specialized meanings, are used in everyday parlance, and there is no reason to conclude that the grand jurors in any manner were inadequately instructed in this regard (*see, Browne v International Bhd. of Teamsters*, 203 AD2d 13, 15 ["actual authorization"]; *Brotherhood of Carpenters v United States*, 330 US 395, 406 ["knowing participation"; "actual authorization"]; *accord, Nathan's Famous v Local 1115*, 70 Misc 2d 257, 258-259).

However, section 807 is applicable to labor disputes, does not purport to establish a standard of criminal liability and does not state appropriate principles applicable under the Penal Law. Nevertheless, insofar as section 807 imposes a heightened standard before allowing imputation of liability from union officers to the union, defendant can hardly claim to have been prejudiced by the advantageous instruction or to have been indicted on the basis of mere agency (*see, e.g.*, the Federal version of Labor Law § 807 [6], 29 USC § 106, which the United States Supreme Court found to impose a sufficiently stringent standard for criminal liability [*Mine Workers v Gibbs*, 383 US 715]; *see also, Brotherhood of Carpenters v United States*, 330 US 395, 406, *supra*). Hence, defendant was indicted under far more exacting standards than would be applicable to a corporation—that a board or high managerial agent recklessly tolerated the criminal conduct of its agents (Penal Law § 20.20).

The Grand Jury was given adequate information to enable it to decide intelligently whether a crime has been committed by the Union and to determine whether there exists legally sufficient evidence to establish the material elements of such crime (*see, e.g., People v Hewitt*, 233 AD2d 171, 172, citing *People v Calbud, Inc.*, 49 NY2d 389, 394-395). The Union has not met its "heavy" burden of establishing that the instructions were so deficient as to impair the integrity of the Grand Jury proceeding and thereby warrant the "extraordinary remedy" of dismissal (*see, People v Harrison*, 238 AD2d 271, *lv denied* 90 NY2d 894; *People v Jones*, 239 AD2d 234).

Accordingly, the order of Supreme Court, New York County (Harold Rothwax, J.), entered on or about June 19, 1996, which dismissed the indictment for enterprise corruption (Penal Law § 460.20) should be reversed, on the law, the indictment reinstated and the matter remanded for further proceedings.

SULLIVAN, J. P., ROSENBERGER and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered on or about June 19, 1996, reversed, on the law, the indictment for enterprise corruption reinstated and the matter remanded for further proceedings.